Uri L. Lamprey *et al. vs.* The State of Minnesota *et al.*

Submitted on briefs Nov. 15, 1892.    Decided Jan. 10, 1893.

Effect of Patent of Lake Shore Land.

When the United States has disposed of the lands bordering on a meandered lake, by patent, without reservation or restriction, it has nothing left to convey, and any patent thereafter issued for land forming the bed, or former bed, of the lake, is void and inoperative.

Effect of Patent of Shore Land as between Patentee and the State Determined by the Law of the State.

Where the United States has made grants, without reservation or restriction, of public lands bounded on streams or other waters, the ques-

| | |
|---|---|
| 52 | 181 |
| 54 | 298 |
| 52 | 181 |
| 76 | 288 |
| 52 | 181 |
| d80 | 105 |
| 52 | 181 |
| 81 | 41 |
| 52 | 181 |
| 82 | 54 |
| 82 | 55 |
| 52 | 181 |
| d86 | 321 |

tion whether the lands forming the beds of the waters belong to the state, or to the owners of the riparian lands, is to be determined entirely by the law of the state in which the lands lie.

### Riparian Rights on Lakes are the Same as on Streams.

The same rules govern the rights of riparian owners on lakes or other still waters as govern the rights of riparian owners on streams. Hence, if a meandered lake is "nonnavigable" in fact, the patentee of the riparian land takes the fee to the center of the lake; but, if the lake is "navigable" in fact, its waters and bed belong to the state, in its sovereign capacity, and the riparian patentee takes the fee only to the water line, but with all the rights incident to riparian ownership on navigable waters, including the right to accretions or relictions formed in front of his land by the action or recession of the water.

### Waters Divided into Public and Private.

The division of waters into navigable and nonnavigable is merely a method of dividing them into public and private, which is the more natural classification; and the definition or test of navigability to be applied to our inland lakes must be sufficiently broad and liberal to include all the public uses, including boating for pleasure, for which such waters are adapted. So long as they continue capable of being put to any beneficial public use, they are public waters.

Appeal by the defendant, the State of Minnesota, from a judgment of the District Court of Ramsey County, *Otis*, J., entered April 8, 1892.

The plaintiffs, Uri L. Lamprey and Jeanne R. Lamprey, his wife, on May 16, 1890, filed their complaint against Oscar M. Metcalf, and made the State of Minnesota a party, under 1878 G. S. ch. 74, § 45. This statute provides that the state may be made a party to an action for the partition of real property. The complaint stated that plaintiffs owned forty-nine fiftieths of three hundred acres of land (describing it) situate in West St. Paul, worth $250,000, and that Metcalf owned the remaining one-fiftieth part, and it prayed partition between them. The complaint further stated that the State of Minnesota claimed some estate or interest in the land adverse to the title of plaintiffs, but that the claim was unfounded and void. It also prayed judgment that the State had no title to or interest in

the land.    The Summons and Complaint were served upon the Attorney General, and in due time the Governor answered on behalf of the State, claiming the *locus in quo* was in the year 1853 a natural lake, and the title in the Federal Government.    That the surrounding shore was surveyed and the lake meandered in September, 1853, under the direction and supervision of the Secretary of the Interior. That by the Act of Feb. 26, 1857, authorizing a state government (11 U. S. Stat. ch. 60, § 2) the lake was made a common highway forever, free to all citizens, and the title vested in this State, and that it has ever since continued therein.    On the trial on February 25, 1892, plaintiffs proved, that in 1856, the Federal Government sold and patented to purchasers, without any reservation whatever, all the land surrounding this lake, and that the plaintiffs and Metcalf had since purchased these shore lands from the patentees.    They further proved that in the year 1860, the lake had so far receded that the Federal Government surveyed the land between the then shore and the old meander line;    and on March 20, 1873, sold and patented this strip to Charles D. Gilmore, who subsequently conveyed it to plaintiffs; that the lake had slowly and imperceptibly receded and diminished in size; that the bed of the lake was now dry land, and they claimed that the rights of the public therein were extinguished. At the trial the parties stipulated as to the facts.    As this land had never been claimed by, or certified to the State, as swamp land under the Act of Congress of March 12, 1860, (12 U. S. Stat. ch. 5,) the Attorney General abandoned all claim to the land under that Act. The trial court found for the plaintiffs, and ordered that judgment be entered as demanded in the complaint.    This was done, and the State appeals.

*Moses E. Clapp*, Attorney General, *H. W. Childs* and *W. N. Jones*, for appellant.

The State of Minnesota relies upon its sovereignty as the origin and source of its title.    The United States having designated the land as a lake by appropriate means, and this having continued until subsequent to the admission of the State into the Union, it was such an appropriation of the bed of the lake as to sever it from the

public lands and to divest the Federal Government of all ownership in it, and the subsequent survey in 1860 was unwarranted, and the patent to Gilmore conveyed no title. The public surveys are conducted pursuant to specific rules and regulations prescribed by the government. Among which are the following: "You are also to meander in manner aforesaid, all lakes and deep ponds of the area of twenty-five acres and upwards; also navigable bayous, shallow ponds, readily to be drained or likely to dry up, are not to be meandered." 1 Lester's L. L. 7:

The United States has no ownership in the beds of meandered lakes within this state. It has but a qualified ownership of the public domain. The rights of the new states in this regard are in no sense inferior to those of the original states. The exclusive jurisdiction of the new states over the beds of its waters is one of the rights of sovereignty. The new states have, upon their admission into the Union, the same rights, sovereignty and jurisdiction as to the soil of their navigable waters, as the older states. Gould, Waters, § 39; *In re Bevans*, 17 Copp's L. O. 18; *In re Burns*, 2 Copp's L. L. 1090; *Weber* v. *Harbor Commissioners*, 18 Wall. 57; *Barney* v. *Keokuk*, 94 U. S. 324.

The beds of lakes have never been recognized as, nor are they in fact, part of the public domain, to which the power of disposition by the United States extends. The questions involved have been mentioned but never decided in this State. *Huntsman* v. *Hendricks*, 44 Minn. 423.

The reasons on which the common-law rules were founded, as applied to the waters of Great Britain, are really at variance with those which must actuate courts of this State in a case like the one at bar. Gould, Waters, § 80; *Paine* v. *Woods*, 108 Mass. 160; *Guest* v. *Reynolds*, 68 Ill. 478; *Canal Commissioners* v. *People*, 5 Wend. 423; *Wheeler* v. *Spinola*, 54 N. Y. 377.

The rule as to riparian ownership which is applied to ordinary fresh water streams cannot be applied to this lake. A boundary upon it does not carry title to its center but only to low-water mark. Such is the rule as to boundaries upon natural ponds and lakes. *Boorman* v. *Sunnuchs*, 42 Wis. 233; *Stoner* v. *Rice*, 121 Ind. 52;

*Edwards* v. *Ogle*, 76 Ind. 308; *Trustees of Schools* v. *Schroll*, 120 Ill. 509.

If the plaintiffs get what land they bought and paid for, they are on an equality with all other citizens of the State who purchased from the Government. There is reason for holding that the thread of a stream is a boundary line, but the reasoning is not applicable in any respect to the case of a lake. In such a case the grant extends only to the water's edge. *Bradley* v. *Rice*, 13 Me. 201; *Waterman* v. *Johnson*, 13 Pick. 261; *State of Indiana* v. *Milk*, 11 Fed. Rep. 389; *Mansur* v. *Blake*, 62 Me. 41; *State* v. *Gilmanton*, 9 N. H. 461; *Fletcher* v. *Phelps*, 28 Vt. 257; *Austin* v. *Rutland Railroad Co.*, 45 Vt. 215; *Delaplaine* v. *Chicago & N. W. Ry. Co.*, 42 Wis. 214; *Inhabitants of West Roxbury* v. *Stoddard*, 7 Allen, 158; *Jakeway* v. *Barrett*, 38 Vt. 316; *Wood* v. *Kelley*, 30 Me. 47.

*Stryker & Moore*, being of counsel for parties in other cases involving the questions in controversy here, were permitted to file a brief, in which they said:

The riparian owner has title to low-water mark and not to the thread or center of the lake. *Ladd* v. *Osborne*, 79 Iowa. 93; *Mariner* v. *Schulte*, 13 Wis. 775; *Nelson* v. *Butterfield*, 21 Me. 229; *Warren* v. *Chambers*, 25 Ark. 120; *Primm* v. *Walker*, 38 Mo. 94; *Commonwealth* v. *Vincent*, 108 Mass. 441; *Seaman* v. *Smith*, 24 Ill. 521; *Niles* v. *Burke*, 1 Pugsley, (N. B.) 237; *Burke* v. *Niles*, 2 Hannay, (N. B.) 166; *Zeller* v. *Yacht Club*, 34 La. Ann. 838; 12 Am. & Eng. Ency. of Law, 506; Gould, Waters, § 203.

The rule contended for by the plaintiffs fits well the exigencies of a case where the purchaser of land upon a deep and permanent body of water is given land in front of his original shore line, which in time becomes dry, through the recession of the water. He may have purchased his land because it was upon the lake, and he should have access to it. But the rule *de minimis non curat lex*, will not dispose of the case of land upon the shore of a Minnesota surface lake, which has none of the characteristics of permanency. Having no current, no distinct banks, no permanent watershed, it gradually—because of improvements about it—evaporates, percolates and finally

dries up.    Because of these conditions it is incapable of true accretions or relictions.

The Minnesota cases have covered the following grounds, but they have gone no further:    The meander line is not a boundary.    The riparian proprietor upon streams navigable in fact, and upon the Great Lakes, owns the land in fee to the low-water mark.    *Schurmeier* v. *St. Paul & Pac. R. Co.*, 10 Minn. 82, (Gil. 59;) *Railroad Co.* v. *Schurmeir*, 7 Wall. 272; *St. Paul, S. & T. F. R. Co.* v. *First Div. St. Paul & Pac. R. Co.*, 26 Minn. 31; *Everson* v. *City of Waseca*, 44 Minn. 247; *Wait* v. *May*, 48 Minn. 453.

And though the riparian proprietor does not take title in fee below low water, he is entitled to enjoy riparian rights incident to the land, and he may disassociate such rights from the shore line, and convey them to persons having no interest in the original riparian estate.    *Brisbine* v. *St. Paul & Sioux City R. Co.*, 23 Minn. 114; *Rippe* v. *Chicago, D. & M. R. Co.*, 23 Minn. 18; *Carli* v. *Stillwater Street Ry. & T. Co.*, 28 Minn. 373; *Union Depot, etc., Co.* v. *Brunswick*, 31 Minn. 297; *Miller* v. *Mendenhall*, 43 Minn. 95; *Hanford* v. *St. Paul & D. R. Co.*, 43 Minn. 104; *Minneapolis Trust Co.* v. *Eastman*, 47 Minn. 301; *Gilbert* v. *Eldridge*, 47 Minn. 210.

It is elementary law that the rights of the State in respect to land may be of two kinds, either governmental or proprietary.    Only public waters can the State acquire in a governmental capacity; private waters and the land under them, can be acquired only in a proprietary way.    "Public" is here synonymous with "navigable," and private with "nonnavigable."    The lake under discussion was nonnavigable; it can therefore be acquired by the State only in a proprietary capacity.    Navigable waters might have been transferred to the State in its governmental capacity, by the means suggested by counsel for the plaintiffs, but not so this shallow pool.

It seems to us evident that if the United States did not dispose of this land through the riparian patents, and we think it did not, title passed by the Gilmore patent,    That patent can only be attacked in a direct proceeding to set it aside.    *Davis* v. *Weibbold*, 139 U. S. 507; *Smelting Co.* v. *Kemp*, 104 U. S. 636; *Johnson* v. *Towsley*, 13 Wall. 72.

*U. L. Lamprey, pro se.*

In the patents conveying these riparian lands pursuant to the survey of 1855, the lake is the boundary whether the meander line coincide with the shore or not. *Schurmeier* v. *St. Paul & Pac. R. Co.,* 10 Minn. 82, (Gil. 59;) *St. Paul, S. & T. F. R. Co.* v. *First Div. St. Paul & Pac. R. Co.,* 26 Minn. 31; *Carli* v. *Stillwater Street Ry. Co.,* 28 Minn. 373; *Everson* v. *City of Waseca,* 44 Minn. 247; *Railroad Co.* v. *Schurmeier,* 7 Wall. 272; *Jefferis* v. *East Omaha Land Co.,* 134 U. S. 178; *Palmer* v. *Dodd,* 64 Mich. 474; *Fuller* v. *Dauphin,* 124 Ill. 542; *Menasha Wooden Ware Co.* v. *Lawson,* 70 Wis. 600; *Wright* v. *Day,* 33 Wis. 260; *Boorman* v. *Sunnuchs,* 42 Wis. 233; *Sphung* v. *Moore,* 120 Ind. 352.

When a patent is issued for land bounded by lake or stream, the title to the land under the water passes from the Government. *Hardin* v. *Jordan,* 140 U. S. 371; *Mitchell* v. *Smale,* 140 U. S. 406; Justinian Lib. 2, Title 1, § 22 and note; Sir Matthew Hale, (De Jure Maris) Lib. 1, ch. 1; Woolrych, Waters, 46; Phear, Waters, 11; Gould, Waters, § 78.

The United States Statutes provide in all cases where the opposite banks of any stream not navigable belong to different persons, the stream and the bed thereof shall become common to both. U. S. Rev. Stat. § 2476; Coulson & Forbes, Waters, 98.

In Scotland, where there are many lakes, often of large extent, there has never been any doubt that the entire lake, if surrounded by the land of a single proprietor, belongs to that proprietor as appertinent of his land. It is true their system of laws is founded upon the civil law, by which lakes and ponds are regularly of private ownership. *Mackenzie* v. *Bankes,* 3 App. Cas. 1324; *Bristow* v. *Cormican,* 3 App. Cas. 641.

The owner of land bordering on an unnavigable lake lying within the congressional survey, is the owner of the bed of such lake to the thread thereof. *Ridgway* v. *Ludlow,* 58 Ind. 248; *Stoner* v. *Rice,* 121 Ind. 51; *Forsyth* v. *Smale,* 7 Biss. 201; *Hodges* v. *Williams,* 95 N. C. 331; *Finley* v. *Hershey,* 41 Iowa, 389; *Webber* v. *The Pere Marquette Boom Co.,* 62 Mich. 626; *Richardson* v. *Prentiss,* 48 Mich. 88; *Fletcher* v. *Thunder Bay Riv. Boom Co.,* 51 Mich. 277; *Smith* v.

*City of Rochester,* 92 N. Y. 463; *Cobb* v. *Davenport,* 32 N. J. Law, 369.

Where riparian estates are conveyed, the general presumption is, that the purchaser's title extends as far as the grantor owns; and this rule applies to a grant from the Crown, a State, or the United States. *Holden* v. *Chandler,* 61 Vt. 291; *Johnson* v. *Anderson,* 18 Me. 76; *Brumagim* v. *Bradshaw,* 39 Cal. 24; *Felder* v. *Bonnett,* 2 McMull. 44; *Brooks* v. *Britt,* 4 Dev. 481; *City of Boston* v. *Richardson,* 95 Mass. 146; *Pratt* v. *Lamson,* 2 Allen, 275; *Duke of Devonshire* v. *Pattinson,* 20 Q. B. D. 263; *Micklethwait* v. *Newtay Bridge Co.,* 33 Ch. D. 133; *Tyler* v. *Wilkinson,* 4 Mas. 397; *Thomas* v. *Hatch,* 3 Sumn. 170; *Jackson* v. *Hathaway,* 15 Johns. 447; *Varick* v. *Smith,* 9 Paige, 546; *Steamboat Magnolia* v. *Marshall,* 39 Miss. 109; *Lawson* v. *Mowry,* 52 Wis. 219; *Cansler* v. *Henderson,* 64 N. C. 469; *Mansur* v. *Blake,* 62 Me. 38; *Mill River Woolen Manuf'g Co.* v. *Smith,* 34 Conn. 462; *Primm* v. *Raboteau,* 56 Mo. 407; *Dunklee* v. *Wilton Railroad Co.,* 24 N. H. 489; *Smith* v. *Ford,* 48 Wis. 115; *Carter* v. *Chesapeake & O. Ry. Co.,* 26 W. Va. 644; *Stanford* v. *Mangin,* 30 Ga. 355; *Muller* v. *Landa,* 31 Texas, 265; *City of Boston* v. *Richardson,* 105 Mass. 351; *Coovert* v. *O'Conner,* 8 Watts, 470.

The common law, so far as it is applicable to our situation and government, is as a general rule, the law of this State. *State* v. *Pulle,* 12 Minn. 164, (Gil. 99.) In *Schurmeier* v. *St. Paul & Pac. R. Co.,* 10 Minn. 82, (Gil. 59,) this court said: "We think in respect to the rights of riparian owners, it is as applicable to the circumstances of the people in this country as in England." And in *Schaefer* v. *Marthaler,* 34 Minn. 487, the court had under consideration a small lake five feet deep, and it held that the riparian rules applicable to a water course or stream, applied to the lake.

The universal rule the world over is, that all additions to land, when formed by gradual and imperceptible degrees, belong to the riparian proprietor. There is no distinction in this respect between soil gained by accretions and that uncovered by relictions. Nor does it make any difference whether the waters are navigable or unnavigable. *Minneapolis Trust Co.* v. *Eastman,* 47 Minn. 301; *Wait* v. *May,* 48 Minn. 453.

The State claims she is the owner of these private lands by virtue of her sovereignty. That is her only claim. Her claim under the swamp land grant was abandoned on the trial. She relies solely on her sovereignty. By its very term the claim is public and not private. This claim of ownership is for the public benefit. In this country each State has succeeded to the rights which the King formerly possessed in rivers and lakes, and in the soil beneath. There are in this country no rights except those of the public on the one hand, and of the individual on the other. For this purpose the State represents the public, and the ownership is that of the people in their united sovereignty. By the common law the property of the sovereign is said to extend to all places where the sea ebbs and flows, whether such places are navigable or not; but the usages of this country have given a limitation to this doctrine, confining the public right to what may be a public use. A stream or lake is a public highway whenever it is suitable in its natural condition for general use in travel, or in the transportation of property. Streams which are not floatable, or cannot in their natural state be used for the carriage of boats, rafts or other property, are absolutely private. The mere possibility of occasional use during brief or extraordinary freshets does not give them a public character. *Morgan* v. *King*, 35 N. Y. 454; *Olson* v. *Merrill*, 42 Wis. 203; *Thunder Bay Riv. Boom Co.* v. *Speechly*, 31 Mich. 336; *Middleton* v. *Flat Riv. Boom Co.*, 27 Mich. 533; *Hubbard* v. *Bell*, 54 Ill. 110; *Brown* v. *Chadbourne*, 31 Me. 9; *Treat* v. *Lord*, 42 Me. 552; *Lewis* v. *Coffey County*, 77 Ala. 190. This right is limited to those waters which are capable of public use. *Rowe* v. *Granite Bridge Corp.*, 21 Pick. 344; *The Montello*, 20 Wall. 430; *Town of Wethersfield* v. *Humphrey*, 20 Conn. 218; *Glover* v. *Powell*, 10 N. J. Eq. 211; *Flanagan* v. *City of Philadelphia*, 42 Pa. St. 219; *Sullivan* v. *Spotswood*, 82 Ala. 163.

In a stream once navigable, the public right may be extinguished by natural causes like recession of the water. *Rex* v. *Montague*, 4 B. & C. 598; *Mayor, etc., of Colchester* v. *Brooke*, 7 Q. B. 339.

Whenever the question in any court, State or Federal, is whether the title to land which had once been the property of the United States has passed, that question must be resolved by the laws of the

United States. *Wilcox* v. *Jackson,* 13 Pet. 517; *Irvine* v. *Marshall,* 20 How. 564; *St. Paul, S. & T. F. R. Co.* v. *First Div. St. Paul & Pac. R. Co.,* 26 Minn. 31.

We have here before the court a case where the grantor, the United States, says it did by its riparian patents, convey the *locus in quo;* and where the grantee says he bought the *locus in quo;* where the patents, written contracts between the parties, include the *locus in quo.* Is it not, then, remarkable that parties should ask this court to disregard the intention of the contracting parties, their written contracts, and the law of the land in reference thereto?

MITCHELL, J. In 1853, at the time of making the United States survey of sections four, (4,) five, (5,) eight, (8,) and nine, (9,) township twenty-eight, (28,) range twenty-two, (22,) there was in the center of these four sections a shallow, nonnavigable lake, comprising about three hundred acres, which the government surveyor meandered, in accordance with the rules and instructions of the department, "to meander all lakes and deep ponds of the area of twenty-five acres and upwards," (1 Lester, Land Laws, 714,) and in doing so ran the meander lines substantially along the margin of the lake. The lake and the meanders thereof appear on the official plat of the survey, and are referred to in the field notes. By this survey the lands bordering on the lake were subdivided into fractional governmental subdivisions and lots, the lake forming the boundary thereof on one side. The survey and plat were approved by the secretary of the interior in 1854. Subsequently, and prior to 1856, the United States, by patents, conveyed, without reservation or restriction, to various parties, all of these lands, which were described in the patents by their governmental subdivision or lot, according to the plat and survey, which were referred to in, and made part of, the patents. By sundry mesne conveyances from the patentees, the plaintiffs and defendant Metcalf have become the owners of all these riparian lands. Since the survey in 1853 the lake has been, through natural causes, gradually and imperceptibly drying up, until now its former bed is all dry land.

In 1860, after the lake had partially dried up, the United States

land department caused a survey to be made of the land constituting that part of the former bed of the lake situate between the original meander line and the then existing margin of the lake, and in 1873 assumed to issue a patent therefor to one Gilmore, who subsequently conveyed to plaintiffs and Metcalf, who assert title to the former bed of the lake both as grantees of the riparian lands according to the original survey of 1853, and also, in part, under the Gilmore patent. The state, on the other hand, claims that the Gilmore patent is void, and that the patents, according to the original United States survey, only conveyed the land to the margin of the lake, as it then existed, and that the former bed of the lake belongs to the state, in its sovereign capacity.     In the pleadings the state also asserted title under the "swamp-land grant" from the United States; but this claim was abandoned on the trial, and very properly so, because, for manifest reasons, it was entirely untenable.

It will be thus seen that the question presented is, what rights in or to the soil under water does the patentee of land bounded by a meandered inland lake acquire by his patent? The same question was suggested in *Huntsman* v. *Hendricks*, 44 Minn. 423, (46 N. W. Rep. 910,) but not decided, in view of its great importance, and the fact that it was not fully argued by counsel.

The importance of the question, both to the public and to riparian owners, is apparent, when we consider that there are many thousands of such lakes in this state, which, although most of them may not be adapted for navigation, in its ordinary, commercial sense, have been, from the earliest settlement of the state, resorted to and used by the people as places of public resort, for purposes of boating, fishing, fowling, cutting ice, etc., and the further fact that observation teaches that the waters of many of these lakes are, from natural causes, slowly but imperceptibly receding, so that a part of what was their bed, when surveyed, has, or in time will, become dry land.

The right of the public to use these lakes for the purposes referred to, as well as the right of riparian owners to these relicted lands, and consequently their right of access to the water after such reliction occurs, are therefore all involved in the question presented. The question ought to be approached and considered from a practical, as

well as legal, standpoint; and as the common law is a body of prin-ciples, and not of mere arbitrary rules, the effort should be to apply the spirit and reason of these principles to the state of facts presented.

There are certain matters which are so well settled that they may be summarily disposed of at the outset. Without troubling ourselves to consider what were the rights of the United States in these waters before they conveyed the lands bordering on them, it is well settled that, having disposed of lands bordering on a meandered lake by patent, without reservation or restriction, they have nothing left to convey, and consequently the land department was thereafter without jurisdiction, and the Gilmore patent, issued in 1873, was inoperative and void; also that a meander line is not a boundary, but that the water whose body is meandered is the true boundary, whether the meander line in fact coincides with the shore or not; also, that grants by the United States of its public lands bounded on streams or other waters, made without reservation or restriction, are to be construed according to the law of the state in which the lands lie; and, consequently, whether the land forming the beds of these lakes belongs to the state, or to the owners of the riparian lands, is a question to be determined entirely by the laws of Minnesota. In support of these propositions, we need only cite *Hardin* v. *Jordan*, 140 U. S. 371, (11 Sup. Ct. Rep. 808, 838,) and *Mitchell* v. *Smale*, 140 U. S. 406, (11 Sup. Ct. Rep. 819, 840.)

In *St. Paul, S. & T. F. R. Co.* v. *St. Paul & P. R. Co.*, 26 Minn. 31, (49 N. W. Rep. 303,) this court was led, from certain *dicta* in *Railroad Co.* v. *Schurmeir*, 7 Wall. 272, to suppose that the supreme court of the United States meant to hold otherwise as to patents of public lands bordering on navigable streams; but that no such doctrine has been adopted by that court is evident from *Barney* v. *Keokuk*, 94 U. S. 324, and subsequent cases.

We therefore approach the question in this case untrammeled by the binding authority of any federal decisions, or even by any direct decisions in this state, in which this is still an open question. What the relative rights of the state and of riparian owners in the waters and beds of these lakes are, largely depends upon the question whether

the rules of law as to the rights of grantees of lands bordering on running streams are applicable to grants of land bordering on lakes. The early English decisions, dealing, as they did, mainly with arms of the sea and rivers in which the tide ebbed and flowed, furnish but little light on this subject. In many of the states of the Union, this branch of the law is still somewhat unsettled, and, as said in *Hunts- man* v. *Hendricks, supra,* the decisions are somewhat conflicting. The subject was recently very ably and exhaustively considered by that eminent jurist, the late Justice Bradley, in *Hardin* v. *Jordan, supra,* in which all the authorities—Roman, English, and American —are collected and reviewed; and we think we may fairly say of the decision in that case that the result and logic of it is that, at common law, the rules governing riparian rights on streams apply, *mutatis mutandis,* to grants of land bordering on lakes; consequently, if they are nonnavigable the grantees, (if their grants are without reservation or restriction,) take to the center of the lake, but that if they are navigable the grantees take the fee only to high water, but with all the riparian rights incident to the ownership of riparian land, including the right to accretions and relictions. It is true that case was controlled by the law of Illinois, and the only question was what the law of that state was; but, having determined that the courts of Illinois had adopted the common law on the subject, it became necessary to ascertain what the common law was; and in that point of view the conclusion arrived at on that question is pertinent here.

As has been already suggested, there are but few authorities on the question in England; for in England proper there are but few lakes, and in Scotland the civil law prevails. The case of *Bristow* v. *Cormican,* 3 App. Cas. 641, goes far towards sustaining the conclusion reached in *Hardin* v. *Jordan,* although it must be admitted that it is left in some doubt as to whether the presumption of ownership to the thread of the stream, which exists with regard to owners of land on the banks of nontidal streams of running water, exists also on inland lakes, navigable in fact, but nonnavigable in the common-law sense.

Coulson & Forbes, in their work on the Law of Waters, (page 98,) say that it does not appear that by the English law there is any difference as to the ownership of the soil between land covered with still

and running water, except, perhaps, in the case of large inland lakes or seas, where the rule that the adjoining riparian owner is owner *ad medium filum aquæ* might cause inconvenience.

The decisions in Massachusetts, (of which Maine was a part,) and which have been followed in most of the New England states, are not particularly in point, for the reason that they have their foundation in the colonial ordinance of 1641–47, prohibiting towns from granting away ponds containing more than ten acres, called "great ponds," and providing that such ponds should be free to the public for fishing and fowling.

In New Jersey, which adhered strictly to the old common-law definition of "navigable waters," it was held that a lake (which, according to the English common law, was nonnavigable) was the private property of the riparian owner; thus applying the same rule that would be applied in case of a nonnavigable stream. *Cobb* v. *Davenport*, 32 N. J. Law, 369.

Whatever doubt once existed as to the law in New York would seem to be fully set at rest by the recent decision of the court of appeals (second division) in *Gouverneur* v. *National Ice Co.*, 134 N. Y. 355, (31 N. E. Rep. 865,) in which, after reviewing all the decisions of the state on the subject, the court holds "that a deed of land bordering on a small, nonnavigable lake or pond is *prima facie* presumed to convey title to the center," saying there would seem to be no substantial reason for the application of a different rule in the legal construction of grants of land bounded on them than is applied to conveyances bounding premises on fresh-water streams, and that the difficulty in locating lines, under this rule, of different proprietors, is not an objection to its general application, as the same difficulties would be met with in the bays or bends of rivers. Substantially the same views are expressed in *Lembeck* v. *Nye*, 47 Ohio St. 336, (24 N. E. Rep. 686;) the court saying that no solid ground is readily perceived for limiting a grant of land bordering on a nonnavigable lake to the water's edge, when, in the case of a nonnavigable stream, its operation extends to the center.

In *Ridgway* v. *Ludlow*, 58 Ind. 248, it was held that the owner of land bordering on a nonnavigable lake, lying within the congressional

survey, is the owner of the bed of the lake to the thread thereof, or a line along the middle of the lake; the court adding that they could see no difference between nonnavigable lakes and nonnavigable rivers, although later, as will be seen, the court somewhat limited this common-law right.

In *Rice* v. *Ruddiman*, 10 Mich. 125, the rule of riparian ownership previously applied to the Detroit river was applied to Lake Muskegon; the court saying that they were not able to discover any fact or circumstance sufficient to make a substantial difference in principle between the two cases, and that the general understanding and common usage of the country have as clearly recognized the principles of riparian ownership with reference to lakes as to rivers within the state, and repudiated any distinction as arbitrary, having no foundation in the nature of things. The same court, in *Clute* v. *Fisher*, 65 Mich. 48, (31 N. W. Rep. 614,) followed in *Stoner* v. *Rice*, 121 Ind. 51, (22 N. E. Rep. 968,) limited this common-law right by holding that the riparian owner of a fractional lot bounded by a nonnavigable lake could only take so much of the lake as is required to fill out the subdivision of the section which he owned. The court seemed to think that they were required to so hold, under the decision in *Brown's Lessee* v. *Clements*, 3 How. 650, but which, with due deference, does not seem to us to have the least application to the question of riparian rights under a grant of land bordering on water. But, having held that the bed of a nonnavigable lake belonged neither to the state nor the United States, the court was compelled to the somewhat peculiar position of holding that if the lake was so large that the lines of the granted lots or fractional subdivisions would not, when extended, embrace the whole of it, then the riparian ownership would extend to the center. We are compelled to the conclusion that this attempted limitation upon riparian ownership is illogical, purely arbitrary, and impracticable.

. The same question has been before the courts of Wisconsin in several cases. *Delaplaine* v. *Chicago & Northwestern Ry. Co.*, 42 Wis. 214; *Boorman* v. *Sunnuchs*, Id. 233, and *Diedrich* v. *Northwestern Union Ry. Co.*, Id. 248.

The general result of these decisions is that, while the courts of that state hold that, whether a stream is navigable or nonnavigable in fact, the title of the bed to the center of the current is in the owner of the bank, but that as to lakes a different rule applies, and that the owner of the land bordering on any *meandered* lake, whether navigable in fact or not, takes the land only to the water's edge; but no special reason is given why a different rule should be applied.

The courts of that state do, however, hold that the riparian proprietor has, as such, the exclusive right of access to and from the lake in front of his land, and of building his piers and wharves in aid of navigation, not interfering with the public easement where the lake is navigable; also, that he has the accretions formed upon or against his land, and those portions of the bed of the lake adjoining his land which may be uncovered by the recession of the water; there being no distinction, in respect to the rights of riparian owners, between accretions and relictions. With these rights conceded to the riparian owner, the question whether the fee of the bed of the lake, while it remains covered with water, is in him or in the state, is more speculative than practical. In most cases where a distinction has been made between riparian rights on streams and on lakes it seems to have been merely assumed, without much consideration, that the rules applicable to running water were not applicable to lake or ponds. The only reasons we have ever seen suggested for a distinction are—*First*, the supposed difficulty of running the lines between adjoining riparian owners of lands bordering on lakes, and, *second*, the supposed injustice that might result, in some cases, in giving the owner of a very small estate on the shore of a lake a very large reliction in front of it.

But it seems to us that neither of these is an adequate reason for departing from a well-settled principle. Both of them are more imaginary than real, and would occur only in exceptional or extreme cases, and are almost as likely to occur in the case of riparian ownership on a tortuous river, with an ill-defined or changeable channel, as in the case of such ownership on the borders of a lake. The owner of a mere "rim" on the bank of a river may sometimes ac-

quire an accretion or reliction much larger than the parent estate, but that is an incident to all riparian ownership; and it was never suggested, in the case of a stream, that such a state of facts furnished any reason for making the case an exception to the general rule.

Courts and text writers sometimes give very inadequate reasons, born of a fancy or conceit, for very wise and beneficent principles of the common law; and we cannot help thinking this is somewhat so as to the right of a riparian owner to accretions and relictions in front of his land. The reasons usually given for the rule are either that it falls within the maxim, *de minimis lex non curat,* or that, because the riparian owner is liable to lose soil by the action or encroachment of the water, he should also have the benefit of any land gained by the same action. But it seems to us that the rule rests upon a much broader principle, and has a much more important purpose in view, viz. to preserve the fundamental riparian right—on which all others depend, and which often constitutes the principal value of the land —of *access to the water.*

The incalculable mischiefs that would follow if a riparian owner is liable to be cut off from access to the water, and another owner sandwiched in between him and it, whenever the water line had been changed by accretions or relictions, are self-evident, and have been frequently animadverted on by the courts. These considerations certainly apply to riparian ownership on lakes as well as on streams. Take the case in hand, of our small inland lakes, the waters of many of which are slowly but gradually receding.

The owners of lands bordering on them have often bought with reference to access to the water, which usually constitutes an important element in the value and desirability of the land. If the rule contended for by the appellants is to prevail, it would simply open the door for prowling speculators to step in and acquire title from the state to any relictions produced in the course of time by the recession of the water, and thus deprive the owner of the original shore estate of all riparian rights, including that of access to the water. The endless litigation over the location of the original water lines, and the grievous practical injustice to the owner of the original riparian estate, that would follow, would, of themselves, be

a sufficient reason for refusing to adopt any such doctrine. That the state would never derive any considerable pecuniary benefit,— certainly, none that would at all compensate for the attendant evils, —we may, in the light of experience, safely assume.

Our conclusion, therefore, is that upon both principle and authority, as well as consideration of public policy, the common law is, that the same rules as to riparian rights which apply to streams apply also to lakes, or other bodies of still water.

In this state, we have adopted the common law on the subject of waters, with certain modifications, suited to the difference in conditions between this country and England, the principal of which are that navigability in *fact*, and not the ebb and flow of the tide, is the test of navigability, and that we have repudiated the doctrine that the state has any private or proprietary right (as had the king) in navigable waters, but that it holds them in its sovereign capacity, as trustee for the people, for public use.

In accordance with the rules of the common law, we therefore hold that where a meandered lake is nonnavigable in fact, the patentee of land bordering on it takes to the middle of the lake; that where the lake is navigable in fact, its waters and bed belong to the state, in its sovereign capacity, and that the riparian patentee takes the fee only to the water's edge, but with all the rights incident to riparian ownership on navigable waters, including the right to accretions or relictions formed or produced in front of his land by the action or recession of the water. Of course, it is a familiar principle that these riparian rights rest upon title to the bank or shore, and not upon title to the soil under the water.

Comparing what was said in *Schurmeier* v. *St. Paul & Pacific R. Co.*, 10 Minn. 82, (Gil. 59,) with what is perhaps implied in *St. Paul, S. & T. F. R. Co.* v. *St. Paul & P. R. Co.*, 26 Minn. 31, (49 N. W. Rep. 303,) it may be not entirely clear whether the doctrine of this court is that a patentee of land on navigable water takes the fee to low water, or only to high water; but this is a matter of little practical importance in any case, and of none in the present one.

What has been already said is sufficient for the purposes of the present case; but, to avoid misconception, it is proper to consider

what is the definition or test of "navigability," as applied to our inland lakes. The division of waters into navigable and nonnavigable is but a way of dividing them into public and private waters,—a classification which, in some form, every civilized nation has recognized; the line of division being largely determined by its conditions and habits.

In early times, about the only use—except, perhaps, fishing—to which the people of England had occasion to put public waters, and about the only use to which such waters were adapted, was navigation, and the only waters suited to that purpose were those in which the tide ebbed and flowed. Hence, the common law very naturally divided waters into navigable and nonnavigable, and made the ebb and flow of the tide the test of navigability. In this country, while still retaining the common-law classification of navigable and nonnavigable, we have, in view of our changed conditions, rejected its test of navigability, and adopted in its place that of navigability in fact; and, while still adhering to navigability as the criterion whether waters are public or private, yet we have extended the meaning of that term so as to declare all waters public highways which afford a channel for any useful commerce, including small streams, merely floatable for logs at certain seasons of the year. Most of the definitions of "navigability" in the decided cases, while perhaps conceding that the size of the boats or vessels is not important, and, indeed, that it is not necessary that navigation should be by boats at all, yet seem to convey the idea that the water must be capable of some commerce of pecuniary value, as distinguished from boating for mere pleasure. But if, under present conditions of society, bodies of water are used for public uses other than mere commercial navigation, in its ordinary sense, we fail to see why they ought not to be held to be public waters, or navigable waters, if the old nomenclature is preferred. Certainly, we do not see why boating or sailing for pleasure should not be considered navigation, as well as boating for mere pecuniary profit.

Many, if not the most, of the meandered lakes of this state, are not adapted to, and probably will never be used to any great extent for, commercial navigation; but they are used—and as population increases, and towns and cities are built up in their vicinity, will be

still more used—by the people for sailing, rowing, fishing, fowling, bathing, skating, taking water for domestic, agricultural, and even city purposes, cutting ice, and other public purposes which cannot now be enumerated or even anticipated. To hand over all these lakes to private ownership, under any old or narrow test of navigability, would be a great wrong upon the public for all time, the extent of which cannot, perhaps, be now even anticipated. When the colony of Massachusetts, two hundred and fifty years ago, reserved to public use her "great ponds," probably only fishing and fowling were in mind; but, as is said in one case, "with the growth of the community, and its progress in the arts, these public reservations, at first set apart with reference to certain special uses only, became capable of many others, which are within the design and intent of the original appropriation. The devotion to public use is sufficiently broad to include them all, as they arise." *West Roxbury* v. *Stoddird*, 7 Allen, 158.

If the term "navigable" is not capable of a sufficiently extended meaning to preserve and protect the rights of the people to all beneficial public uses of these inland lakes, to which they are capable of being put, we are not prepared to say that it would not be justifiable, within the principles of the common law, to discard the old nomenclature, and adopt the classification of public waters and private waters. But, however that may be, we are satisfied that, so long as these lakes are capable of use for boating, even for pleasure, they are navigable, within the reason and spirit of the common-law rule. When the waters of any of them have so far receded or dried up as to be no longer capable of any beneficial use by the public, they are no longer public waters, and their former beds, under the principles already announced, would become the private property of the riparian owners.

Judgment affirmed.

(Opinion published 53 N. W. Rep. 1139.)