## STATE v. ELIZA KORRER and Others.[1]

September 11, 1914.

Nos. 18,551—(4).

**Navigable water.**

1. A meandered lake, approximately 150 acres in extent, naturally suitable for boating, bathing, hunting, fishing and other beneficial public uses, on the shore of which is situated a village of 2,000 inhabitants, is a public or navigable body of water.

**Navigable and non-navigable water.**

2. Natural bodies of water are classed as navigable or non-navigable. The term navigable, as used in this connection, has been extended beyond its technical signification. It is unnecessary that the water should be capable of commerce of pecuniary value. The division of waters into navigable and non-navigable is but another way of dividing them into public and private waters. If a body of water is adapted for use for public purposes, it is a public or navigable water.

**Rule of the English common law.**

3. Under the English common law the crown owned the soil under the tide water and also the soil under the water of navigable rivers up to the point reached by the flow of the tide. The soil under fresh water rivers above tide water and the soil under fresh water lakes belonged to the owners of the shore land.

[1] Reported in 148 N. W. 617.

---

Note.—What waters are navigable, see note in 42 L.R.A. 305.

Title to land under water, see notes in 42 L.R.A. 161, and 1 L.R.A.(N.S.) 762.

Right of riparian owner to erect and maintain wharves, see note in 40 L.R.A. 635.

**Rule in Minnesota.**

4. In the United States each state determines for itself the question of the ownership of the soil underlying its public waters. The United States government never owned the soil under public waters, and its patent to the shore land does not pass title to the land under the water. This belonged to the states, and if the riparian owner has acquired it at all it is by the favor or concession of the state. In Minnesota the title of the proprietor of abutting lands extends to low-water mark. The title to the soil under the waters below low-water mark is held by the state, not in the sense of ordinary absolute proprietorship, but in its sovereign governmental capacity, for common public use, and in trust for the people of the state, for the public purposes for which they are adapted. This rule applies to all public waters, lakes as well as streams.

**Riparian rights of owner of shore land.**

5. The shore owner has well defined riparian rights in the adjacent water and the soil under it below low-water mark. These rights include the right of access, the right to accretions and relictions, the right to wharf out and the right, absolute as respects every one but the state, to improve, reclaim and occupy the surface of the submerged land out to the point of navigability for any private purpose.

**Same — subject to the control of the state.**

6. These rights are not unrestricted but are subject to the control of the state. The state has power to conserve the integrity of its public lakes and rivers. The riparian owner has no right against the protest of the state to destroy the bed of a public lake for the private purpose of taking ore therefrom.

**Diversion of bed of lake from public use.**

7. The question is not wholly one of interference with present public use. The fact that in the opinion of the court the portions of the lake in controversy are, during low-water mark, not capable of any substantial beneficial use does not prevent the state from objecting to its diversion to a private use foreign to the public uses of the water and the soil under it.

**Right in soil between high and low-water mark.**

8. The fee to the soil between high and low-water is in the abutting owner, subject to the right of the public to use or reclaim it for public purposes. The shore owner has the right, during periods of recession of water, to take ore from this space, provided the state does not require it for public purposes, and provided he shall not measurably interfere with the utilization of it for such prospective uses.

Action in the district court for St. Louis county against Eliza Korrer, Edmund N. Korrer, Annie L. Korrer, John Brennan, White Iron Lake Iron Co., Albert B. Coates, Martha R. Coates, and Euclid Iron Mining Co. to enjoin defendants from interfering with the public waters of Longyear lake, from removing the iron ore under said lake and the natural waters thereof, from removing the iron ore from under that part of the bed of said lake which would be covered by the waters thereof in the natural condition of said lake at the time of the commencement of the action but for the erection by defendants of the embankment or dump mentioned in the complaint, and for an accounting as to any ore unlawfully removed prior to or pending the action. The case was heard before Cant, J., who made findings and ordered judgment in favor of defendants. From the judgment entered pursuant to the order for judgment, plaintiff appealed. Reversed.

*Lyndon A. Smith,* Attorney General, and *C. Louis Weeks,* Assistant Attorney General, for appellant.

*Crassweller, Crassweller & Blu, Washburn, Bailey & Mitchell, John Brennan* and *T. L. Doyle,* for respondents.

*John R. Van Derlip,* as *amicus curiæ,* filed a brief supporting the position of respondents.

HALLAM, J.

The bed of Longyear lake contains deposits of iron ore both between high and low-water mark and below low-water mark. Defendants own land abutting on the lake. Upon their taking steps to remove the ore beneath the bed of the lake, and for that purpose to fill in the lake bed from the shore to a point some distance below low-water mark, the state brought this action to restrain them. Both the state and the defendants claim a proprietary interest in the ore underlying the bed of the lake. The real issue involved is whether the state has such interest in this body of water and the bed thereof that it may enjoin the defendants from filling in and reclaiming the bed of the lake for the purely private purpose of removing the underlying ore. We shall address ourselves to this issue.

A consideration of this question requires some examination into

the character of this lake and into the history of the rights of the government and of the riparian owner in waters of this character.

1. The first question is: What is the character of this body of water? The trial court found "that Longyear lake is a meandered public body of water * * * having an area of more than one hundred and fifty acres in extent * * * that within the entire natural limits of said lake the same during high water is naturally suitable for boating, bathing, hunting, fishing and other beneficial public uses; that on the shore of said lake and in the main on the westerly shore thereof * * * is situated the village of Chisholm, having a population of more than two thousand inhabitants." The finding in substance is that these facts constitute Longyear lake a "public body of water." This finding is sustained by the evidence.

2. Natural bodies of water are *classed* as navigable or non-navigable. The term "navigable," as used in this connection, has been extended beyond its technical signification and embraces many bodies of water not navigable in the ordinary sense of that term. The division of waters into navigable and non-navigable is but another way of dividing them into public and private waters, and navigable waters embrace all bodies of water public in their nature. It is not necessary that the water should be capable of commerce of pecuniary value. If a body of water is adapted to use for public purposes other than commercial navigation, it is held to be public water, or navigable water, if the old nomenclature is preferred. Boating for pleasure is considered navigation, as well as boating for mere pecuniary profit. "Navigability for pleasure is as sacred in the eye of the law as * * * navigability for other purposes." City of Grand Rapids v. Powers, 89 Mich. 94, 50 N. W. 661, 14 L.R.A. 498, 28 Am. St. 276. "Many, if not the most, of the meandered lakes of the state, are not adapted to, and probably will never be used to any great extent for, commercial navigation; but they are used—and as population increases, and towns and cities are built up in their vicinity, will be still more used —by the people for sailing, rowing, fishing, fowling, bathing, skating, taking water for domestic, agricultural, and even city purposes, cutting ice, and other public purposes which cannot now be enumerated or even anticipated. To hand over all these lakes to private owner-

ship, under any old or narrow test of navigability, would be a great wrong upon the public for all time, the extent of which cannot, perhaps, be now even anticipated." Mitchell, J. in Lamprey v. State, 52 Minn. 181, 199, 200, 53 N. W. 1139, 1143, 18 L.R.A. 670, 38 Am. St. 541. See also Chicago, M. & St. P. Ry. Co. v. City of Minneapolis, 115 Minn. 460, 133 N. W. 169, Ann. Cas. 1912D, 1029.

Applying these rules, it must be held that this lake is a public body of water and is governed by the law applicable to public or navigable fresh water lakes.

3. The next question is: What are the respective rights of the state and the riparian proprietors in such public waters? It has been said that under the early common law there was no assertion of public right in the waters or the soil under them, and that all land under water which could be profitably used passed by the grants of the crown into private ownership. Farnham, Waters & Water Rights, § 36, p. 166. This may be true, but this private right received no recognition in any early judicial decision and received very little attention from the early commentators. In the reign of Elizabeth a lawyer named Digges advanced the theory that the proprietorship of all tide water and tide land, together with accretions and relictions, was in the crown, and that all use of the shore below high-water mark by the adjacent proprietors was illegal. Farnham, Waters & Water Rights, § 36, p. 167. The assertion of this alleged right by the crown was much opposed, and the claim was modified by royal concession and later by legislation, so that the title of the crown was to be considered as held for public uses and subject to certain riparian rights. The theory that the crown owned the title to the soil of navigable rivers up to a point reached by the flow of the tide of the sea was probably an outgrowth of this same doctrine. As applied to rivers this theory received judicial recognition early in the reign of James I, when, in the case of The Royal Fishery of the Banne, Davis Rep. 55, 56 (Moore, H. & L. of Foreshore & Seashore, 248) it was held that "every navigable river, so high as the sea flows and ebbs in it, is a royal river." See also Bulstrode v. Hall, 1 Sid. 148. Whatever its origin, the rule that the soil of tidal navigable rivers belongs to the crown has been consistently followed for several centuries as the com-

mon law of England. Lord Adv. v. Hamilton (1852) 1 Macq. (H. of L.) 46.

This doctrine did not apply to navigable fresh-water streams above tide water or to fresh-water lakes. There were few such streams and practically no such lakes in England, and the law applicable to such bodies of water received scant attention. Apparently there were no judicial decisions clearly defining rights in fresh-water lakes or rivers prior to the separation of the colonies from England. It is worthy of note that Blackstone, in his Commentaries published on the eve of the Revolution, makes no mention of this subject at all. After the Revolution, and in 1787, there was published a manuscript, written more than 100 years before by the eminent jurist and commentator, Sir Matthew Hale. This contained the following: "Fresh rivers of what kind soever, do of common right belong to the owners of the soil adjacent; so that the owners of the one side have, of common right, the propriety of the soil, and consequently the right of fishing, *usque filum aquæ;* and the owners of the other side the right of soil or ownership and fishing unto the *filum aquæ* on their side. And if a man be owner of the land of both sides, in common presumption he is owner of the whole river, and hath the right of fishing according to the extent of his land in length. With this agrees the common experience." De Juris Maris, Part I, c. I. These views were not at once accepted as settling the law of England. In 1863 doubt was expressed as to whether the soil of lakes belongs to the owners of the land on either side *"ad medium filum aquæ."* Marshall v. Ullewater Steam Navigation Co. 3 Best & S. 742; and as late as 1883 Lord Denman said in Williams v. Wilcox, 8 Ad. & El. 336, that the question whether the soil of public navigable rivers above the flow of the tide was at common law in the crown or the owners of the adjacent land was "a point perhaps not free from doubt." The views of Sir Matthew Hale are now, however, recognized as the common law of England. Hindson v. Ashby (1896) L. R. 2 Ch. Div. 78.; Orr Ewing v. Colquhoun, L. R. 2 App. Cas. 839; Scott v. Napier (H. of L.) 7 Ct. of Sess. Cas. 35 (1869) (a Loch of Scotland) ; Bristow v. Cormican (1878), L. R. 3 App. Cas. 641 (a Lough of Ireland).

127 M.—5.

4. In the United States the rule is not uniform. The common law of England, as it existed at the time of the separation of the colonies, is followed here as far as applicable to our conditions. But, in the first place, the common law of England on this subject was not then well settled, and, secondly, the authorities are not agreed as to whether conditions are so similar here in this respect as to require the adoption of what is now established as the English rule. A classification of waters based upon the ebb and flow of the tide has been rejected in many cases as unsuited to our conditions, and it was long ago said by the United States Supreme Court: "If a distinction is made on that account, it is merely arbitrary, without any foundation in reason; and, indeed, would seem to be inconsistent with it." The Genesee Chief, 12 How. 443, 454, 13 L. ed. 1058. The most that has ever been said for this basis of classification is that it is a convenient test and easy of application. Cobb v. Davenport, 32 N. J. Law, 369; Woodcliffe Land Imp. Co. v. New Jersey S. L. R. Co. 72 N. J. Law, 137, 60 Atl. 44; Illinois Central R. R. Co. v. Illinois, 146 U. S. 387, 435, 13 Sup. Ct. 110, 36 L. ed. 1018. In another case that court declared that to permit private ownership of the beds of navigable waters was "at variance with sound principles of public policy." Barney v. Keokuk, 94 U. S. 324, 24 L. ed. 224. It is now well settled, however, that this is not a Federal question, but that each state must determine for itself the question of the ownership of the soil underlying its public waters. Barney v. Keokuk, 94 U. S. 324, 24 L. ed. 224. The result is much confusion. Courts of some states hold that title to the bed of navigable waters is in the riparian proprietor in a proprietary capacity. The Steamboat Magnolia v. Marshall, 39 Miss. 109; Kinkead v. Turgeon, 74 Neb. 580, 104 N. W. 1061, 109 N. W. 744, 1 L.R.A.(N.S.) 762, 7 L.R.A.(N.S.) 316, 121 Am. St. 740, 13 Ann. Cas. 43; Wilson v. Watson, 141 Ky. 324, 132 S. W. 563, 35 L.R.A.(N.S.) 227; Johnson v. Johnson, 14 Idaho, 561, 95 Pac. 499, 24 L.R.A.(N.S.) 1240; Admrs. of Gavit v. Chamber & Coats, 3 Ohio, 496. Others hold that the title to the bed of all navigable waters is in the state in a proprietary capacity. Chapman v. Kimball, 9 Conn. 38, 21 Am. Dec. 707. Others hold that the title to the beds of navigable rivers is in the state and the beds

of navigable lakes in the riparian owner. Cobb v. Davenport, 32 N. J. Law, 369. Others hold that the title to beds of navigable lakes is in the state and the beds of navigable rivers in the riparian owner. Seaman v. Smith, 24 Ill. 521; Illinois Cent. R. R. Co. v. City of Chicago, 173 Ill. 471, 50 N. E. 1104, 53 L.R.A. 408; Schulte v. Warren, 218 Ill. 108, 75 N. E. 783, 13 L.R.A.(N.S.) 745; Fletcher v. Phelps, 28 Vt. 257; Willow River Club v. Wade, 100 Wis. 86, 76 N. W. 273, 42 L.R.A. 305; State v. Gilmanton, 9 N. H. 461. Some courts hold, as we shall see more fully later on, that the title is in the state in its sovereign capacity in trust for the people.

In Minnesota the decisions bearing upon this subject are numerous. The earliest case is that of Schurmeier v. St. Paul & Pac. R. Co. 10 Minn. 59 (82), 88 Am. Dec. 59. This case is relied upon as adopting the rule of the English common law that the owner of land bordering on a navigable stream takes title to the middle of the bed of the stream. The case in fact involved the question of title to a so-called island which lay above low-water mark, and the decision of the court was that "a tract of land bounded on the Mississippi river extends at least to the low-water mark." The decision of this question determined the case. A majority of the court, however, took occasion to approve the English common-law rule as to the ownership of the beds of fresh-water streams. In this view Justice Berry did not concur, and the language of the majority of the court in this regard was not essential to a decision of the case.

On appeal to the Supreme Court of the United States, that court, referring to the provisions of the original act of May 17, 1796, providing for the sale of public lands, used the following pointed language: "The court does not hesitate to decide that Congress, in making a distinction between streams navigable and those not navigable, intended to provide that the common-law rules of riparian ownership should apply to lands bordering on the latter, but that the title to lands bordering on navigable streams should stop at the stream, and that all such streams should be deemed to be, and remain public highways." Railroad Co. v. Schurmeir, 74 U. S. (7 Wall.) 272, 288, 289 (19 L. ed. 74).

In St. Paul, S. & T. F. R. Co. v. First Division St. Paul & Pac.

R. Co. 26 Minn. 31, 49 N. W. 303, and Morrill v. St. Anthony Falls Water Power Co. 26 Minn. 222, 2 N. W. 842, 37 Am. Rep. 399, this court referred to its decision in the Schurmeier case as holding the English common-law rule in force in this state, but, deferring to the language of the United States Supreme Court in the same case on appeal, held that in the case of lands acquired by patent from the Federal government the title of the patentee "stops at the stream and that the title to the beds of such streams is reserved to the government." The last portion of this statement, that the title is reserved to the government, evidently meaning the Federal government, seems unwarranted by the Federal decision relied upon, and is directly contrary to earlier Federal decisions which held that "the shores of navigable waters, and the soils under them, were not granted by the Constitution to the United States, but were reserved to the states respectively; and the new states have the same rights, sovereignty and jurisdiction over this subject as the original states." (Pollard's Lessee v. Hagan, 44 U. S. [3 How.] 212, 11 L. ed. 565; Mumford v. Wardwell, 73 U. S. [6 Wall.] 423, 436, 18 L. ed. 756); and the doctrine that the matter was controlled by act of Congress had already been repudiated by the explicit declaration of the Federal court in the later case of Barney v. Keokuk, 94 U. S. 324, 24 L. ed. 224, to the effect that the determination of the rights of riparian proprietors in public waters is a question which each state must decide for itself. In view of this position of the Federal supreme court in the Pollard, Mumford and Barney cases, the declarations that the title to the bed of public waters was in the Federal government, or that the question of such title was governed by Federal law, could not be allowed to stand, and they were not followed in subsequent cases.

In Union Depot, St. Ry. & T. Co. of Stillwater v. Brunswick, 31 Minn. 297, 17 N. W. 626, 47 Am. Dec. 789, the subject was again fully considered. This case involved the extent and nature of the rights of the defendants, as riparian owners of land upon the shore of the navigable waters of the river or lake of St. Croix. The subject was fully considered and, so far as the title to the bed of the waters was concerned, was plainly deemed an open question. The decisions in St. Paul, S. & T. F. R. Co. v. First Division St. Paul & Pac. R.

Co. 26 Minn. 31, 49 N. W. 303, and Morrill v. St. Anthony Falls Water Power Co. 26 Minn. 222, 2 N. W. 842, 37 Am. Rep. 399, that the title to the bed was reserved in the Federal government, were not followed. Barney v. Keokuk was not cited, but the court accepted the doctrine of that case that the right of riparian owners in such cases "is wholly a matter for the state to determine the extent of its own rights." The Schurmeier case, 10 Minn. 59 (82), 88 Am. Dec. 59, was followed as settling the law "that the riparian owner has the fee to low-water mark," but was followed no further. The decision reached in the Brunswick case was that the title to the bed of the stream below low-water mark "vests in the state as a sovereign right." The failure of the court to follow the language of the majority in the Schurmeier case, 10 Minn. 59 (82), 88 Am. Dec. 59, as to ownership of the bed of the stream, was not apparently, as claimed by defendants, based upon the authority of Morrill v. St. Anthony Falls Water Power Co. 26 Minn. 222, 2 N. W. 842, 37 Am. Rep. 399, or St. Paul S. & T. F. R. Co. v. First Division St. Paul & Pac. R. Co. 26 Minn. 31, 49 N. W. 303, nor upon any misunderstanding of the effect of the Federal decisions, but rather upon what the court conceived to be the correct principle of law, for the court cites upon this point only the Pollard and Mumford cases, in which cases the doctrine of ownership in the state received decided approval. The decision in the Brunswick case that the state owns the bed of navigable waters settled the law on that subject, and it has been followed in a long line of cases. Miller v. Mendenhall, 43 Minn. 95, 44 N. W. 1141, 8 L.R.A. 89, 19 Am. St. 219; Hanford v. St. Paul & Duluth R. Co. 43 Minn. 104, 42 N. W. 596, 44 N. W. 1144, 7 L.R.A. 722; Bradshaw v. Duluth Imperial Mill Co. 52 Minn. 59, 65, 53 N. W. 1066; Lamprey v. State, 52 Minn. 181, 198, 53 N. W. 1139, 18 L.R.A. 670, 38 Am. St. 541.

At the risk of some repetition, the law on this branch of the case may be stated as follows:

When the American Revolution was concluded, the people of each state became themselves sovereign, and in that character held the absolute right to all their navigable waters and the soils under them for their own common use, and continued to do so subject only to the

rights since surrendered by the Constitution to the general government. The soil under navigable waters was not granted by the Constitution to the United States, but was reserved to the states respectively, and the new states had the same rights. St. Anthony Falls Water Power Co. v. St. Paul Water Commrs. 168 U. S. 349, 359, 18 Sup. Ct. 157, 42 L. ed. 497. When the United States government issues its patent to public land bordering upon navigable water, the land under the water does not pass to the riparian proprietor by force of the patent, because the United States does not own it, but if the riparian owner acquires it at all it is by the concession or favor of the state which does own it. Barney v. Keokuk, 94 U. S. 324, 24 L. ed. 224; Hardin v. Shedd, 23 Sup. Ct. 685, 47 L. ed. 1156, 190 U. S. 508, 519; Franzini v. Layland, 120 Wis. 72, 81, 82, 97 N. W. 499. We conceive that the state of Minnesota has never conceded away its title as sovereign to its navigable waters or to the soil under them, and that the law of the state now is that the title of the proprietor of lands abutting upon navigable waters extends to low-water mark; that the title to the bed of the stream or body of water, below low-water mark, is held by the state, not, however, in the sense of ordinary absolute proprietorship with right of alienation but in its sovereign governmental capacity, for common public use, and in trust for the people of the state for the public purposes for which they are adapted.

This rule is not peculiar to this state, but is adopted in many other jurisdictions. Town of Brookhaven v. Smith, 188 N. Y. 74, 80 N. E. 665, 9 L.R.A.(N.S.) 326; Barnes v. Midland R. Terminal Co. 193 N. Y. 378, 85 N. E. 1093, 127 Am. St. 962; McLennan v. Prentice, 85 Wis. 427, 444, 55 N. W. 764; Rhode Island Motor Co. v. City of Providence (R. I.) 55 Atl. 696; Walbridge v. Robinson, 22 Idaho, 236, 125 Pac. 812, 43 L.R.A.(N.S.) 240; State v. Gerbing, 56 Fla. 603, 47 South. 353, 22 L.R.A.(N.S.) 337. And it is not far from the English rule now prevailing in respect to tidal waters. Gann v. Free Fishers, 11 H. L. Cas. 192; Attorney General v. Johnson, 2 Wils. Ch. 87; Attorney General v. Tomline, L. R. 14 Ch. Div. 58.

In Minnesota the rights of shore owners of land bordering on lakes are the same as those of owners of land bordering on rivers. Lamprey v. State, 52 Minn. 181, 53 N. W. 1139, 18 L.R.A. 670, 38 Am. St.

541. As to the Great Lakes and other larger lakes like Lake Champlain, it is agreed that the title to underlying soil is in the state. 1 Farnham, Waters & Water Rights, p. 264, § 58; State v. Franklin Falls Co. 49 N. H. 240, 250, 6 Am. Rep. 513. As to smaller lakes the rule, as above indicated, is not uniform. When a lake is so small in size as to constitute merely a pond and to be entirely upon the land of one individual, no question of public ownership is raised. Between this class of lakes or ponds and the Great Lakes there are a large number which are more or less useful to the public. There is a point in the diminishing size, below which no one can doubt that the title should be in the individual. Conversely, there is a point above which every one will agree that the title must be in the state. 1 Farnham, Waters & Water Rights, p. 265, § 58a. In the Minnesota cases no distinction is made between the rights of the owner of land abutting upon Lake Superior and the rights of owners of land upon public waters of smaller size. This court has made navigability the dividing line. All public or navigable waters are placed in the same class. The rules applied to Lake Superior are likewise applied to smaller lakes, provided only they are in the class of public waters. The shore owner of land on non-navigable or private lakes takes title to the middle of the lake. Lamprey v. State, 52 Minn. 181, 53 N. W. 1139, 18 L.R.A. 670, 38 Am. St. 541; Tucker v. Mortenson, 126 Minn. 214, 148 N. W. 60. But the shore owner of land on navigable or public lakes takes only to low-water mark.

5. But while the shore owner owns the fee only to low water mark, he has certain well defined rights in the water and the soil under it below low-water mark. These rights are designated riparian rights. Riparian rights are incident to the ownership, not of the bed of the water, but of the shore land. The riparian owner has the right to the use of the water and has the right of access to it for that purpose. To that end he may follow it as it recedes. He has the title to the reliction caused by the gradual recession of the water and to the accretion caused by the washing of sand, dirt and gravel ashore. The rights of riparian owners have received very full consideration by this court. They include the right of the riparian owner to build and maintain, for his own and the public use, suitable wharves, piers and landings,

on and in front of his land, and to extend the same therefrom into the river, to the point of navigability, even though beyond low-water mark, and to this end exclusively to occupy the surface of the bed of the water, subordinate and subject only to the rights of the public, and to such needful rules and regulations for their protection as may be prescribed by competent legislative authority. Brisbine v. St. Paul & Sioux City R. Co. 23 Minn. 114, 130. This private right of use and enjoyment is not limited to purposes connected with the actual use of the navigable water, but may extend to any purpose not inconsistent with the public right. Hanford v. St. Paul & Duluth R. Co. 43 Minn. 104, 111, 42 N. W. 596, 44 N. W. 1144, 7 L.R.A. 722. The riparian owner has, subject to this public right, the exclusive right of possession and the entire beneficial interest in the surface of the underlying soil. Union Depot, St. Ry. & T. Co. of Stillwater v. Brunswick, 31 Minn. 297, 302, 17 N. W. 626, 47 Am. Rep. 297. He has the exclusive right—absolute as respects *every one but the state,* and limited only by the public interests of the state for purposes connected with public uses—to improve, reclaim and occupy the surface of the submerged land, out to the point of navigability, for any private purpose, as he might do if it were his separate estate. Hanford v. St. Paul & Duluth R. Co. 43 Minn. 104, 118, 42 N. W. 596, 44 N. W. 1144, 7 L.R.A. 722. The exercise of such rights, though subject to state regulation, can be interfered with only for public purposes. The rights which thus belong to him as riparian owner of the abutting premises are valuable property rights of which he cannot be divested without consent, except by due process of law, and, if for public purposes, upon just compensation. Brisbine v. St. Paul & Sioux City R. Co. 23 Minn. 114, 129.

6. Throughout all of these cases runs the thread of reserved state control. All of them were controversies between private parties. In all of them is distinctly recognized the power of the state to regulate and control the use of the water, particularly below low-water mark. While the Minnesota cases recognize the right to use the bed of the stream or lake for purposes not connected with the actual use of the water, we know of no case in Minnesota or elsewhere where the right of the riparian proprietor has been recognized as possessing the right

of utilizing the bed of a public body of water below low-water mark for purely private purposes disconnected with the use of the water, to the extent of destroying its existence, and against the protest of the state.

It may be noted that no decided case has ever sustained the title of the riparian owner to the minerals under public waters or the right to remove them under any circumstances. In most of the cases in which such questions have arisen the state is held to be the owner of the underlying soil in its proprietary capacity. Steele v. Sanchez, 72 Iowa, 65, 33 N. W. 366, 2 Am. St. 233; Brandt v. McKeever, 18 Pa. St. 70; Taylor v. Commonwealth, 102 Va. 759, 47 S. E. 875, 102 Am. St. 865; Lord Adv. v. Wemyss (1900) L. R. App. Cas. 50; See, also, Gould, Waters, § 10. In such cases it is held that "the state and it alone has the right to develop those hidden sources of wealth." Taylor v. Commonwealth, 102 Va. 776, 47 S. E. 875, 102 Am. St. 865. In Florida the rule as to title to the soil under navigable waters is substantially the same as in this state, and the rights of riparian owners are made by statute at least as large as they are in this state. In the case of State v. Black River Phosphate Co. 32 Fla. 82, it was held that the riparian owner had no right to take phosphate from the bed of a navigable river under any circumstances, except by consent of the state duly given by the law-making power and upon such terms and conditions as it may prescribe (p. 114). We need not in this case go even this far. Under the law of this state the state owns the soil under public waters in a sovereign not a proprietary capacity, but still the state owns it and the shore owner does not. Whether the riparian owner has any beneficial interest in the minerals underlying the bed of the lake where they can be removed without destroying the lake bed, we are not called upon to determine. We do hold that the state has the power to conserve the integrity of its public lakes and rivers and that riparian rights of the shore owner do not include the right to fill and destroy the bed of a navigable lake for the purpose of taking ore therefrom, against the protest of the state. Manifestly if the lake can be filled in for this private purpose it may be filled in for any private purpose, as for agriculture or grazing, upon a showing of greater utility being subserved by such private use. The ·

propriety of filling in the public lakes and streams of the state for such private purposes, is not primarily a judicial question. Other authorities bearing upon this particular question are not numerous, nor altogether direct, but we think they point to the conclusion just stated. In Gould, Waters (3d ed.) § 179, it is said:

"Riparian owners upon navigable *fresh* rivers and lakes may construct, in the shoal water in front of their land, wharves, piers, landings, and booms in aid of and not obstructing navigation. This is a riparian right, being dependent upon title to the bank and not upon title to the river bed. Its exercise may be regulated or prohibited by the state."

In Farnham, Waters & Water Rights, page 528, § 113, it is said as to the right of a riparian owner to wharf out:

"This right is subject to public regulation, and, if the public good requires that no wharves or piers shall be constructed at any particular place, they may be forbidden."

In Lincoln v. Davis, 53 Mich. 375, 19 N. W. 103, 51 Am. Rep. 116, where it is held that "the title to the soil under the navigable waters of the Great Lakes became vested in the state as sovereign," it was held that "the state can forbid any erections in navigable waters, and on navigable streams and along the Great Lakes can fix the distance beyond which private erections cannot be maintained."

In Attorney General v. Smith, 109 Wis. 532, 85 N. W. 512, it was held that a structure built by a riparian owner upon the bed of a navigable lake, not in aid of navigation, is an invasion both of the state's title and the rights of the public, and that it may be suppressed at the suit of the state.

City of St. Paul v. Chicago, M. & St. P. Ry. Co. 63 Minn. 331, 63 N. W. 267, 65 N. W. 649, 68 N. W. 458, 34 L.R.A. 184, bears upon this question. Defendant built a freight house on a public levee under license given by the city council, on condition that the city engineer be of the opinion that the same shall in no manner interfere with the navigation of the river. It was held that the state holds the levee in its sovereign capacity in trust for the public, for the purposes for which it was dedicated, that, if the freight house was used without reference to traffic with craft navigating the river, its construc-

tion would constitute a diversion of the property to a use foreign to that to which it was dedicated, and that the license for its construction was void and might be revoked. These cases are not directly in point, but we think they sustain the principle we have laid down.

We have not overlooked the finding of the trial court that in recent years the depth of the water in the lake has been substantially lessened so that during low water the portion here in controversy is not capable of any substantial beneficial use, and that the water is occasionally so low that it is incapable of any public use whatever. The question is not wholly one of interference with present public use. In City of St. Paul v. Chicago, M. & St. P. Ry. Co. 63 Minn. 330, 63 N. W. 267, 65 N. W. 649, 68 N. W. 458, the court said: "Neither does it appear whether there exists any present public necessity for the use of this land for levee purposes. This last consideration would, of course, not be controlling, for the fact that the land is not presently needed for levee purposes would not prevent the city or state, as the trustee of the public, from objecting to a diversion of the property to a use wholly foreign to or inconsistent with that to which it was dedicated."

It was said by Cooley, C. J., by way of illustration, in Attorney General v. Evart Booming Co. 34 Mich. 462, 473: "A highway usually includes within its limits more than is ever made use of for public purposes; but, as it is set apart for public use, provided there shall be occasion, the appropriation by an individual is unlawful, though it occasion no present inconvenience to any one, and it may be abated because the result of its being persisted in might be to obscure and, possibly, in the end, to defeat the public right altogether, and thus preclude enjoyment by the public in case the use of that which was inclosed should ever be needed for highway purposes."

The conclusion is that the defendants have no right to take ore from the bed of Longyear lake below low-water mark and for that purpose to fill in the bed of the lake.

8. The remaining question is as to the rights of the parties in the space between high and low water. We are of the opinion that within this space the riparian owner has a qualified right to mine. Many courts and text writers lay down the rule that the title of the riparian owner stops at high-water mark. Others hold that his title

extends to low-water mark. This is a matter for each state to determine for itself. In this state it has been settled for nearly 50 years that the title of the riparian owner extends to low-water mark. Schurmeier v. St. Paul & Pac. R. Co. 10 Minn. 59 (82), 88 Am. Dec. 59; Union Depot, St. Ry. & T. Co. v. Brunswick, 31 Minn. 297, 17 N. W. 626, 47 Am. Rep. 789; Hanford v. St. Paul & Duluth R. Co. 43 Minn. 104, 111, 42 N. W. 596, 44 N. W. 1144, 7 L.R.A. 722; Village of Wayzata v. Great Northern Ry. Co. 50 Minn. 438, 52 N. W. 913; In re Minnetonka Lake Improvement, 56 Minn. 513, 58 N. W. 295, 45 Am. St. 494; Gniadck v. N. W. Imp. & Boom Co. 73 Minn. 87, 75 N. W. 894; Reeves v. Backus-Brooks Co. 83 Minn. 339, 86 N. W. 337. While the title of a riparian owner in navigable or public waters extends to ordinary low-water mark, his title is not absolute except to ordinary high-water mark. As to the intervening space his title is limited or qualified by the right of the public to use the same for purpose of navigation or other public purpose. The state may use it for any such public purpose, and to that end may reclaim it during periods of low water, and protect it from any use, even by the riparian owner, that would interfere with its present or prospective public use, without compensation. Restricted only by that paramount public right the riparian owner enjoys proprietary privileges, among which is the right to use the land for private purposes. Hanford v. St. Paul & Duluth R. Co. 43 Minn. 104, 112, 42 N. W. 596, 44 N. W. 1144, 7 L.R.A. 722; In re Minnetonka Lake Improvement, 56 Minn. 513, 520, 58 N. W. 295, 45 Am. St. 494; Gniadck v. N. W. Imp. & Boom Co. 73 Minn. 87, 75 N. W. 894; State v. District Court of Kandiyohi County, 119 Minn. 132, 137 N. W. 298; People v. Jones, 112 N. Y. 597, 20 N. E. 577. The rights of the riparian owners are accordingly distinctly different in and to the space between high and low-water mark from what they are below low-water mark.

Applying the foregoing principles to this case, it appears to us:

That the defendants have the right during periods of recession of water to take ore from the space between high and low-water mark, provided the state does not require the use of this space for authorized public purposes, and provided they shall not measurably inter-

fere with the utilization of such space for such prospective public uses.

That the state is entitled to an injunction restraining the defendants from taking ore below low-water mark and from filling in or in any manner interfering with the bed of the lake below that point.

Judgment reversed and case remanded with directions to proceed in accordance with this opinion.

On November 20, 1914, the following opinion was filed:

PER CURIAM.

Defendants White Iron Lake Iron Company, John Brennan, Eliza Korrer, and Annie L. Korrer move for a reargument of the case. The state and the defendant Euclid Iron Mining Company both petition that further direction be given the trial court to the end that proper judgment may be given relative to the rights of the parties in certain ore which has already been taken from the bed of Longyear lake.

It will be borne in mind that the defendants Eliza Korrer and Annie L. Korrer were and are the owners of the shore land, that they gave a mining lease to the defendant White Iron Lake Iron Company, that this company in turn gave a mining lease to defendant Albert B. Coates, and this lease was assigned to the Euclid Iron Mining Company.

After the commencement of the action, and before the trial thereof, a stipulation was made between the state and defendant Euclid Iron Mining Company, which recited that, upon a certain area of Longyear lake below the low-water mark, the waters had been by said defendant forced back by an embankment, and that a body of ore within this area had already been stripped and prepared for mining, and it was stipulated that said defendant might remove the ore so stripped, and that said defendant should pay the state 60 cents per ton for ore it should so remove and which it should be finally adjudged did not at the beginning of the action belong to the fee owners of the shore land.

On this stipulation the trial court ordered that the Euclid Iron

Company be permitted to remove the ore so stripped and uncovered, and that it should pay to the state 60 cents per ton for ore which it might remove from said area, "for which, under the final determination of the court in this action, it is under no obligation to pay royalty to the fee owners and those claiming under them."

The trial court made no finding that any ore was in fact removed by the Euclid Company from this area. In fact the taking of evidence bearing on the right to ore taken from such area and to an accounting therefor was reserved until the rights of the parties should be further determined. We are assured, however, that ore was taken out of this area pursuant to this stipulation and order.

A majority of the court construe this stipulation as giving the state the right to an accounting only in the event the state is found to be the owner in a proprietary capacity of the mineral underlying Longyear lake. The decision of this court explicitly holds that the state owns the bed of this lake below low-water mark, "not, however, in the sense of ordinary absolute proprietorship with the right of alienation but in its sovereign governmental capacity, for common public use, and in trust for the people of the state for the public purposes for which they are adapted." From this it necessarily follows that the state has no right to recover the value of the ore, and no right to an accounting under the stipulation.

Whether the law-making power of the state and the shore owner may by joint action provide for the mining of the ore under the waters of this lake, is a question here not presented and it is not decided.

The several applications for a rehearing are denied.