G. W. BLOOMQUIST v. E. V. SANDERS AND OTHERS.[1]

March 13, 1925.

No. 24,475.

**When opinion of experts is not conclusive on court or jury.**

1. Where the matter of inquiry is not of a highly specialized or technical nature, but is one where common knowledge and experience are potent determinative factors in its solution, the opinions of experts are not conclusive on the court or jury.

**Finding as to effect of ditch on level of meandered lake sustained.**

2. The finding that a drainage project as planned will not substantially lower the water level of a meandered lake is sustained.

[1]Reported in 202 N. W. 496.

**Construction of bulkheads and spillways.**

    3. In drainage proceedings bulkheads and spillways, designed to keep waters outside the drainage basin in statu quo, may be constructed.

    *Headnote 1.  See Evidence, 22 C. J. pp. 729, 739, 731, § 823.

    Headnote 2.  See Drains, 19 C. J. p. 683, § 153.

    Headnote 3.  See Drains, 19 C. J. p. 686, § 159.


Action in the district court for Kanabec county. The case was tried before Searles, J., who ordered judgment in favor of defendants. From an order denying his motion for a new trial, plaintiff appealed. Affirmed.

*Will A. Blanchard,* for appellant.

*Godfrey G. Goodwin, J. C. King* and *P. S. Olsen,* for respondents.


HOLT, J.

Action by owner of land abutting a meandered lake to enjoin the construction of a public drainage ditch, because, as planned, it will lower the lake. The court found that it would not substantially affect the water level of the lake, and denied the injunction. Plaintiff appeals.

Lewis Lake, in Kanabec county, is a meandered lake of a size and condition to serve the public in various ways, and hence entitled to have its present water level preserved and safeguarded. Some 120 rods northeast from the lake a ditch in a duly-established drainage system is to cut the brook which is the natural outlet of the lake and which empties into Rum river. The bottom of the ditch is to be some five feet deeper than the bottom of the brook, and has a grade which will carry the water thence to Rum river much more swiftly than is now its course along the brook channel. However, the drainage construction provides for a cement bulkhead or spillway where the brook enters the ditch, the top of which is even with the present bottom of the brook. This will always preserve the bottom of the stream at that point from erosion. The brook from the outlet of the lake to this ditch is very winding and sluggish as it passes through an extensive marsh or meadow. Some

15 rods before entering the ditch, high land approaches close to the brook, and along this ridge passes a public road with a bridge spanning the brook. At the time witnesses testified to taking the levels, the lake surface was one and eight tenths (1.8) foot higher than the bottom of the brook as it will be at the spillway.

Only two testified, one for plaintiff and one for defendants. Both were engineers of some experience in drainage construction. They agree that the fall at the spillway will increase the swiftness of the flow of the brook above it, and therefore they conclude that by erosion the bed of the brook will be lowered clear to the lake so as to be on a level with the top of the spillway and thus tend to lower the surface of the lake. This testimony notwithstanding, the court found "that if the ditch in controversy is constructed and established pursuant to the order therefor referred to in the complaint, it will not lower the waters in said lake to a substantial depth from its present and natural level." The only contention on this appeal is that this finding is contrary to the evidence.

The record indicates that in the ditch proceeding the court was solicitous concerning the maintenance of the natural water level in this lake, and, of its own motion, directed the engineer to plan the bulkhead and spillway so as to accomplish that purpose. And as so planned this drainage system was established and ordered constructed. What effect the ditch constructed with the spillway as planned will have on the lake level, is not wholly within the knowledge of experts. This appears quite clearly from the witness who qualified the most highly as an expert. After testifying that, if the spillway was built eight inches to one foot higher than planned, it would protect against all danger of lowering the lake the 1.8 foot he opined might result, he said the drainage system as planned would ultimately affect the natural water level of the lake, "but only probably after a very great many years. The bed of the creek flowing from Lewis lake is very hard dense material and it will take a long period of erosion to scour out the bed of that creek. That it will scour out eventually is, of course, true but how many years it will require to scour out that bed it would be very hard to determine, perhaps, not in your lifetime or mine, that is, scour out the

bed of the creek enough to do any damage to Lewis lake." That a trier of facts is not bound by expert opinion in matters wherein common knowledge and experience are factors that enter into a conclusion is well established. The effect on Lewis lake by this ditch and spillway cutting the brook cannot be said to be a highly specialized matter. Moratzky v. Wirth, 74 Minn. 146, 76 N. W. 1032; Boyd v. City of Duluth, 126 Minn. 33, 147 N. W. 710; Whitney v. Kaliske, 131 Minn. 261, 154 N. W. 1100; Remington v. Savage, 148 Minn. 405, 182 N. W. 524; Head v. Hargrave, 105 U. S. 45, 26 L. ed. 1028; The Conqueror, 166 U. S. 110, 17 Sup. Ct. 510, 41 L. ed. 937; Ewing v. Goode (C. C.) 78 Fd. 442; Baker v. Richmond C. M. Works, 105 Ga. 225, 31 S. E. 426. With the uncertain predictions of the expert, above set out, the general knowledge and experience of the learned trial judge, who has spent more than 60 years since he attained manhood in close touch with that part of the state here involved, ought to count much in determining whether, when the bottom of the brook is at one point protected from ever being eroded or lowered, it is at all likely that this stream of the sluggish and winding character shown, will cause any erosion at all at the outlet of the lake, in a direct line, some 120 rods above. The evidence does not show for what distance from the spillway towards Rum river the brook continues sluggish. The ditch must discharge in that river, and the testimony is that, although 5 feet lower than the spillway, its grade is such as to carry off rapidly the water which will discharge into it, hence the inference is permissible that the brook must from there on, at least in part of its course, be also swift. If that distance be short from the spillway, it is clear that it has caused no appreciable erosion above the spillway in recent times, for the meadow is only about one foot above the ordinary water level in the brook.

Should the future prove the court mistaken, the present water level in the lake may still be maintained. The other abutting shore-owners are not parties to this action, and, of course, are not bound by the judgment or findings herein. Furthermore, there are statutory proceedings whereby a bulkhead or spillway at the outlet of the lake may be established whenever it appears necessary for its

conservation. Section 751 and sections 6588 to 6602, G. S. 1923. That this court has always manifested a keen interest in the preservation of the navigable waters of the state which are capable of enjoyment by the public for its use, is evident. Lamphrey v. State, 52 Minn. 181, 53 N. W. 1139, 18 L. R. A. 670, 38 Am. St. 541; Witty v. Board of Co. Commrs. 76 Minn. 286, 79 N. W. 112; Madsen v. Larsen, 117 Minn. 369, 135 N. W. 1003; State v. Korrer, 127 Minn. 60, 148 N. W. 617, 1095, L. R. A. 1916C, 139; In re County Ditch 34, 142 Minn. 37, 42, 170 N. W. 883; State ex rel. v. District Court, 144 Minn. 78, 174 N. W. 522; Jensen v. County of Nicollet, 159 Minn. 140, 198 N. W. 455. It is also clear to us that the court below both in the drainage proceeding and in this action was intent upon conserving the natural water level in Lewis lake. With this disposition on the part of the trial court we cannot well infer that he has reached a wrong conclusion in the finding assailed.

Appellant raises the point that the court in the drainage proceeding had no authority to put in a spillway or any structure to control the water level in the lake, it not being in the drainage area, and relies on the Jensen case, supra. It is not applicable. There it was held that the improvement proposed was radically different from the one petitioned for. Here the spillway in the drainage proceeding was to prevent the draining of waters outside of the drainage basin. It was merely a precautionary step taken within the territory drained to leave outside territory in statu quo.

The order is affirmed.

STONE, J. (dissenting.)

In this case a competent civil engineer testified for each party. The witness for plaintiff was sure that the lake would be lowered. The one for defendants disagreed, but admitted that the terrain between the outlet of the lake and the spillway "was pretty marshy but 15 feet would be the approximate width (of the present channel) but 6 feet of spillway with a free fall will make a great deal more water than will the channel of that sluggish stream." In view of

that admission of what seems an obvious fact, I am at a loss to understand what the objection is to modifying the conclusions of law and order for judgment so that the court will retain jurisdiction to require an increase in the altitude of the spillway upon application made for that purpose at any time in the future when accompanied by a showing of an actual lowering of the level of the lake through an artificial acceleration of the out-flow.

The lake in question is another one of the natural reservoirs and retarding basins with which the glacial period so richly blessed Minnesota, and which drainage enthusiasts have been all too willing to destroy. The simplicity and effective protection of the precautionary measure which would be worked out by the modification suggested commend it to my judgment—particularly so, as nobody has suggested any objection to it.

True, plaintiff and his neighbors desiring to maintain this lake in a state of nature may resort to the procedure provided for in the statutes referred to in the majority opinion. But a mere glance at those provisions deomnstrates the mere possibility of an adequate remedy as distinguished from the assurance thereof to which plaintiff is entitled. This action demonstrates that the right of a land owner is threatened. To me it seems our duty to give adequate protection against the threat rather than to remit plaintiff to a mere possibility of getting relief at the hands of some county board. I am at a loss to see why plaintiff should be affected in this action by the irrelevant fact that "other abutting owners are not parties" thereto. The suggestion seems to be that "should the future prove the court mistaken" in this case, some of plaintiff's neighbors may procure the relief to which plaintiff is entitled, but which we are now denying him for all time by the bar of a judgment. Frankly, I cannot appreciate that method of dealing with the rights of a citizen.