J. E. MEYERS AND ANOTHER v. LAFAYETTE CLUB, INC.[1]

May 1, 1936.

No. 30,778.

[1]Reported in 266 N. W. 861.

*Snyder, Gale & Richards* and *Edmund T. Montgomery,* for appellant.

*Malmberg & Nelson, Sherman W. Child,* and *Thompson, Hessian & Fletcher,* for respondents.

I. M. OLSEN, JUSTICE.

The defendant appeals from an order overruling its demurrer to the complaint. The court certified that the questions raised by the demurrer are important and doubtful.

The action is brought under the uniform declaratory judgments act. The trial court is asked to declare that the use made by the defendant of water from Lake Minnetonka, in Hennepin county, for sprinkling its golf course on a tract of land owned by it bordering on the lake is excessive and unlawful, or, if the court finds that defendant is entitled to use some amount of the water for that purpose, that the court then determine the amount of water it may so use. There is a further general prayer for such other relief as the court may find plaintiffs entitled to.

The complaint alleges that the plaintiff Meyers owns a tract of six acres of land with a frontage of 628 feet on the lake, with buildings thereon, occupied by him and others during the year; that plaintiff Thompson owns an undivided one-half of part of two lots, with a frontage of 89 feet on the lake, with a small summer cottage thereon, occupied by him at intervals during the year. It is alleged, in substance, that during a number of years prior to 1935 the waters of the lake have gradually receded so that in the fall of the year 1934 the water level had reached a low stage of 922.98 feet above sea level; that the main average high level of the water is

929.73 feet; that as a result of this recession of the water level strips of shore land have become uncovered and grown up with weeds, and the shores have become unsightly and unfit for pleasure and health use; that the water along the shores has become shallow and weedy; that bathing places used by plaintiffs and others have become shallow and weedy and their usefulness impaired or destroyed; that sand bars in the lake have become uncovered; that plaintiffs' property has materially decreased in value because of the lowering of the water level in the lake. It is alleged that defendant's excessive and unlawful use of the water for sprinkling its golf course has been a large contributing cause to the lowering of the water level. As to the amount of water taken from the lake, it is alleged that for several years last past the defendant, by pumping water through a pipe and into an elevated tank on its grounds for sprinkling its golf course during the three summer months of each year, has, as estimated by plaintiffs, taken 12,960,000 gallons each year. And plaintiffs, on information and belief, say the golf course is in use for more than three months each year and that defendant uses more than the estimated amount each season. It may reasonably be inferred that the water so claimed to be taken is, in part at least, used for sprinkling lawns and for domestic purposes on defendant's property.

Lake Minnetonka is navigable water and is one of the larger lakes in this part of the state. It is some 10 or 12 miles distant from the city of Minneapolis and has been and is a recreation place for people residing in that city and elsewhere. The lake, as shown by public plats and records, has a total length of about 10 miles and a water area of approximately 20 square miles. The length of the shore line is difficult to measure from maps or plats but may safely be estimated to be at least 100 miles, there being numerous bays and arms and what are known as "upper" and "lower" lakes. The shore line is all occupied, largely by summer cottages, but also with a number of fine residences. There are also several villages bordering on the lake. Most of the cottages and residences are occupied during the summertime only, but a number are occupied the whole year.

The defendant, Lafayette Club, is a membership corporation. It has no capital stock and is not operated for profit or for commercial purposes. The members, some 700 in number, pay annual dues for the upkeep of the club. The membership is limited to a fixed number. The club owns a tract of 51 acres bordering on Lake Minnetonka. On this property it has a large clubhouse, several cottages, and other buildings for the use of its members. There are lawns and grounds around the buildings. Part of the grounds are prepared and used as a golf course. How large this golf course is does not appear. It is referred to in the complaint as "an extensive and very well kept up golf course." The purpose for which defendant is organized is to conduct a club or society for social enjoyment, mental and physical culture, and to acquire and own a clubhouse and appropriate grounds in connection therewith. See Lafayette Club, Inc. v. Roberts, 196 Minn. 605, 265 N. W. 802. It does not operate a public golf course. Its grounds, buildings, and golf course are for the use of its members only. A member may bring a guest, and if the guest uses the golf course the member is charged a small greens fee therefor. In effect, each member is an owner in common of his proportionate share of the club property. The property is used in the summertime for the pleasure and recreation of the members, for the same essential purposes as summer cottages and country homes around this lake are used by the owners thereof.

It is common knowledge that because of deficiency in precipitation and dry and hot summers causing excessive evaporation all lakes in the southern part of this state, including the Lake Minnetonka area, suffered great lowering of their water levels during the several years prior to 1935. There were exceptions where lakes were fed by constantly running streams, but most of the smaller streams also dried up. Many lakes practically dried up. Lake Minnetonka does not appear to have any river or stream with a constant flow coming into it. In wet years or years of ordinary precipitation, no doubt water comes into the lake from surrounding lands through draws, small inlets, and surrounding hillsides, but in very dry seasons such inflow of water practically ceases. The limit of low

water in the lakes mentioned appears to have been reached in the summer and fall of 1934. In that year there were extreme drought conditions and great loss of crops on that account in this state. In 1935 there was more abundant precipitation, and lake levels generally rose to a small extent. So far this year there has been an excess of precipitation to some extent. It is well known that dry years and wet years come and go in cycles in this state. Extremely dry years such as came up to and including 1934 are usually followed by a series of wet years, with precipitation above normal, when lakes and sloughs are filled to overflowing, and drainage work is undertaken to relieve farm lands. There are some general causes which, to some extent, may have permanently lowered water levels in lakes and rivers in the Lake Minnetonka area and generally throughout the southern half of this state. These causes are the cutting down of the large areas of native timber, the extensive drainage of small lakes, ponds, and sloughs, which were storage basins and feeders of larger lakes and streams, and the cultivation of drained land and other lands which before had furnished runoff water for the lakes.

Plaintiffs, as noted, present the figures as to the water level of Lake Minnetonka in the fall of the year 1934, and the "main average high-water elevation" of the lake. What is meant by "main average high-water elevation" is not very clear. How this was arrived at or over what period of years the calculation was made does not appear. The average high-water elevation, because of conditions already stated, is bound to change as time goes on irrespective of the amount of water that may be taken out for sprinkling or other purposes by the hundreds of riparian owners. It is alleged in the complaint that there has been a dam constructed at the lake outlet, which is Minnehaha Creek, running into the Mississippi River. If we understand the purpose of this dam, it is to hold back the water in the lake at a higher level than if the natural outlet was not obstructed by the dam. More important, however, is the fact that one cannot arrive at any basis for measuring the effect of the taking of water from the lake for sprinkling or other purposes by this defendant, or by all the riparian owners, by comparing the

extreme low-water level, under drought conditions in 1934, with the average high-water level. If the plaintiffs had presented figures to show the average low-water level of the lake over a sufficient length of time prior to the use of any of the water by defendant for sprinkling purposes, such figures might have had some slight bearing upon the question of the effect of defendant's use of the water.

It is interesting to read what was said by this court in the case of In re Minnetonka Lake Improvement, 56 Minn. 513, 58 N. W. 295, 45 A. S. R. 494, as to description of the lake and surroundings in 1894, and the difference between extreme high-water and extreme low-water levels prior to that time, and as to the changes in water level being irregular, except that they occur periodically according as the years or seasons are wet or dry. We quote [56 Minn. 517]:

"Lake Minnetonka is a large, navigable body of water, situated mainly, but not wholly, in Hennepin county. The shores of the lake are in some places somewhat steep and abrupt, and in other places low and flat, and bounded by large tracts of low land, only slightly elevated above the ordinary level of the water in the lake. * * * The height of the water in the lake varies in different years and at different seasons of the same year, according as the year or season of the year is wet or dry,—the difference between extreme high water and extreme low water, according to observations taken during a series of years, being something like six feet; extreme high water being 223.65, and extreme low water being 217.84, measured from an arbitrary base line. These changes in the height of the water are irregular, without fixed quantity or time, except that they occur periodically, according as the year or the season of the year is wet or dry."

The complaint contains the general allegation that defendant's use of the water has been a large contributing cause to the lowering of the lake water level. There is no allegation as to the amount in feet or inches that the water level has been lowered by such use by defendant.

In their brief counsel for defendant present figures as to the effect on the water level of the lake of taking therefrom 13,000,000

gallons of water in a year, taking into account the area of the water. According to their calculations, the taking of this amount of water from the lake in one year would lower the lake level 1/26 of an inch, and it would take 26 years to take one inch of water from the water area. If twice that amount were taken each year, it would take 13 years to take one inch of water from the water area. Plaintiffs have not disputed these figures by their brief or argument. When it is borne in mind that the lake will in all probability, at sometime during any 26- or 13-year period, fill up to high-water mark, or over, from abundant precipitation, and thus restore any low level reached before that time, the amount of water taken by defendant does not appear to have caused any material or substantial lowering of the lake level. Plaintiffs cite Sanborn v. People's Ice Co. 82 Minn. 43, 53, 84 N. W. 641, 644, 51 L. R. A. 829, 83 A. S. R. 401, where this court said:

"The amount of water taken is not material. If the interference is persistent, and substantially reduces the natural level of the lake, it is sufficient."

That statement supports defendant's contention that there must be a "substantial" reduction of the water level, by improper use thereof, in order to constitute a cause of action. It must be borne in mind that in that case there was ice taken from the lake for commercial purposes and shipped to distant places for sale. Here the defendant, as a riparian owner, made no commercial or artificial use of the water, using it only for the upkeep of its grounds for the pleasure and recreation of its members, who were in effect the owners in common of this property. It may be noted that the complaint in the Sanborn case, 82 Minn. 43, 84 N. W. 641, 51 L. R. A. 829, 83 A. S. R. 401, was held good on the ground that the taking of ice therein complained of was for commercial use and shipment to distant places for sale and was an artificial use or taking.

In Pinney v. Luce, 44 Minn. 367, 369, 46 N. W. 561, 563, the court said:

"All that the law requires of the party by or over whose land a stream passes is that he should use the water in a reasonable man-

ner, and so as not to destroy, or render useless, or materially diminish or affect, the application of the water by the proprietors, above or below."

It is also there held that under the limitations stated the riparian owner should not be barred from so using the water for "domestic, agricultural, and manufacturing purposes."

The right of a riparian owner to have the water retained in its original state is qualified by the right of other riparian owners to make a reasonable use of the water, even if such use results in some damage to the complainant. Note in 70 A. L. R. pp. 222-224. Cases are cited from 17 states, Canada, and England. Dumont v. Kellogg, 29 Mich. 420, 18 Am. R. 102, is a leading case.

The riparian owner has the right to make reasonable use of the water for domestic, agricultural, and mechanical purposes, so far as it does not interfere with the reasonable use of the water by other riparian owners. 67 C. J. § 278, pp. 850-851. Irrigation is an agricultural purpose.

In the Sanborn case, 82 Minn. 43, 50, 84 N. W. 641, 642, 51 L. R. A. 829, 83 A. S. R. 401, it is said:

"In respect to all bodies of public water, in common with riparian owners, the public have the ordinary right of usage. These include the right of boating, fishing, and the use of the water or ice for the ordinary purposes."

The same rules as to riparian rights which apply to navigable streams apply also to navigable lakes. Lamprey v. State, 52 Minn. 181, 53 N. W. 1139, 18 L. R. A. 670, 38 A. S. R. 541; State v. Korrer, 127 Minn. 60, 148 N. W. 617, 1095, L. R. A. 1914C, 139. And the soil under navigable streams and lakes belongs to the state, in its sovereign capacity, for common public use. The title of the riparian owner extends only to low-water mark. But the riparian owner has well defined rights in the water and soil below low-water mark and becomes owner of land attached to his property by recession of the water. The private riparian rights extend to any use of the water and soil not inconsistent with the public right. State v. Korrer, 127 Minn. 60, 148 N. W. 617, 1095, L. R. A. 1916C, 139.

The use that may lawfully be made of the water of navigable streams and lakes by the public includes the taking of water therefrom for domestic, agricultural, and city purposes, and for cutting ice and other purposes which cannot be enumerated. Lamprey v. State, 52 Minn. 181, 53 N. W. 1139, 18 L. R. A. 670, 38 A. S. R. 541.

No complete statement of the uses which a riparian owner may make of the water of a navigable stream or lake has been or can be made. As already noted, such owner may lawfully use the water for domestic, agricultural, mechanical, and other ordinary purposes. The uses extend to any purpose not inconsistent with the public right. In the early case of Morrill v. St. Anthony Falls W. P. Co. 26 Minn. 222, 228, 2 N. W. 842, 846, 37 Am. R. 399, the court said:

"We think the right in the riparian owner to put the water to any useful purpose may be sustained by considerations of public policy. It is certainly for the interests of the public that where the waters of a navigable stream may, without interfering with the public right, be put to some useful purpose, the right to so use them should exist."

See also Hanford v. St. Paul & D. R. Co. 43 Minn. 104, 42 N. W. 596, 44 N. W. 1144, 7 L. R. A. 722.

Plaintiffs quote from Erickson v. Minnesota & Ontario Power Co. 134 Minn. 209, 212, 158 N. W. 979, 980, as follows:

"The owner of land abutting upon a lake or stream is entitled to have the water maintained at the natural and ordinary level at all times, and this rule applies to ordinary low water and ordinary high water."

That case involved the issue of recovery of damages for flooding lands, claimed to have been caused by the negligent or improper maintenance of a dam across the river outlet of the lake on which the flooded land was located. The general statement quoted does not attempt to define the rights of a riparian owner to use the water of the lake for his own proper purposes as such owner, or the limitations of such rights. Later in that opinion the court states what

it conceives to be the proper rule as applied to that and similar cases, as follows [134 Minn. 216]:

"Where there is no other right involved, a new trial should not be granted to a plaintiff because of an erroneous dismissal of his cause where it is plain that he could recover no more than nominal damages, or where, though the amount of the damage does not appear, there is nothing to make it appear that the damage that he suffered was substantial."

This clearly recognizes the right of a riparian owner to make use of the water for proper purposes so long as he does not thereby cause substantial damage to other riparian owners, as held in cases hereinbefore cited.

In some of the cases the term "reasonable use" is employed. While, as stated in plaintiffs' brief, there is no fixed rule as to what will constitute a reasonable use, the cases and authorities cited by both parties lead to the conclusion that any use made of the water by a riparian owner for domestic purposes or proper upkeep of his riparian land is a reasonable use unless it is so excessive as to cause substantial damage to the property of other riparian owners, or materially interferes with public rights.

The use of this lake water by the defendant for the sprinkling of its grounds bordering on the lake was not a commercial or artificial use. It was such a use as any riparian owner might reasonably make so long as his use of the water did not substantially interfere with the use thereof by other riparian owners nor cause material damage to their property. There is no claim of any interference with the rights of the state or the public, nor could these plaintiffs raise any question as to any such interference.

It is argued that the questions of the effect on the water level of taking the water from the lake by defendant and the damage resulting therefrom to plaintiffs' property are questions of fact for trial and cannot be decided on demurrer. This court, on appeal from an order such as here presented, does not decide any issuable fact. The review here is limited to the question of law as to whether the complaint, liberally construed, states a cause of action

under the uniform declaratory judgments act. If the complaint, so construed, negatives any right of plaintiffs to the relief sought, then the demurrer should be sustained.

In determining the questions of law presented, consideration has been given to the allegations of the complaint and the situation and circumstances of the parties as alleged; the amount of water alleged to have been taken by defendant and the use made thereof; the area and surroundings of the lake as shown by our own prior decisions and public plats and records; the well known climatic conditions and decreased water level of lakes in this area up to and including the year 1934; the various causes of the lowering of water levels of lakes during the years prior to 1935; and the calculations as to the effect of the claimed taking by defendant of the amount of water alleged in the complaint. It may be assumed that plaintiffs have at least not minimized the amount of water so taken.

The conclusions reached are that the taking of the lake water by defendant, as alleged in the complaint, was not unlawful or unreasonable, but a permissible taking and use; that the amount so taken was not so excessive as to cause any substantial or appreciable damage to the property of plaintiffs or other riparian owners; and that, on the complaint herein, the plaintiffs cannot show any unlawful or unreasonable taking of lake water or show themselves entitled to any relief in this action.

Defendant argues that the case is not one coming within the uniform declaratory judgments act. Plaintiffs quote G. S. 1923, § 9165, permitting one or more to sue or defend for all when the question is one of common or general interest to all, or those who might be made parties are so numerous that it is impracticable to make them all parties. This statute has been in force in this state since early days. In adopting the uniform declaratory judgments act, L. 1933, c. 286, 3 Mason Minn. St. 1934 Supp. §§ 9455-1 to 9455-16, however, the legislature, in § 11 of the act provided:

"When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding."

It is alleged in the complaint that plaintiffs bring the action in behalf of themselves and in behalf of all other persons similarly situated and affected by the matters set out in the complaint. The question of whether under this provision of the act or for other reasons urged by defendant the action cannot be maintained under that act need not here be determined. That question should be more fully argued and presented when it arises in some action which necessarily requires its decision.

The order appealed from is reversed.

STONE, JUSTICE, took no part in the consideration or decision of this case.

