WILLIAM O. PETRABORG AND OTHERS v. EMIL ZONTELLI
AND OTHERS.
YOUNGSTOWN MINES CORPORATION, APPELLANT.[1]

June 9, 1944.

No. 33,727.

[1]Reported in 15 N. W. (2d) 174.

*Murphy & Cook, Gillette, Nye, Harries & Montague,* and *J. B. Putnam,* for appellant.

*Ryan, Ryan & Ryan,* for respondents.

YOUNGDAHL, JUSTICE.

This action was brought to restrain defendants from constructing a dam and draining the eastern section of Rabbit Lake in connection with certain contemplated mining operations thereon. The court permanently enjoined such activity. Defendant Youngstown Mines Corporation appeals from an order denying its motion for a new trial.

The trial court issued a temporary restraining order and an order to show cause why a temporary injunction should not issue. At the hearing on the order to show cause, affidavits were submitted and some oral testimony received. To secure a prompt determination of the important issues involved, the parties stipulated that the action be submitted to the court on the merits upon the affidavits and oral testimony received. Upon this stipulation the following material facts were established: Rabbit Lake is a meandered lake covering approximately 1,500 acres. It consists of two sections, lying east and west, connected by a narrower portion of the lake, locally known as the "Narrows," and draining eventually through small streams into the Mississippi River. Both portions of the lake as well as the Narrows are of sufficient depth to accommodate small craft such as rowboats and boats equipped with outboard motors and have in fact been so used by the public generally and persons living around the lake. Apart from its use for navigation, both sections have been used for swimming, fishing, and hunting.

In 1924, defendant Youngstown Mines Corporation, hereinafter referred to as Youngstown, procured a lease from the state under L. 1917, c. 110, Minn. St. 1941, § 93.35, subd. 1 (Mason St. 1927, § 6428), covering a portion of said lake bed for mining purposes and authorizing Youngstown to drain off the waters thereof to ac-

complish such objective. Shortly thereafter Youngstown proceeded to purchase drainage rights from owners whose property abutted upon the eastern section of the lake and employed plaintiff M. E. Ryan, an attorney at law and also owner of an undivided interest in certain property abutting upon the north shore of the eastern section of the lake, to assist in procuring such transfers. Ryan did not convey any interest in his own property to Youngstown, but the result of other conveyances of undivided interests in the same property operated to make Ryan and Youngstown cotenants therein.

Plaintiffs Petraborg for 14 years have owned 80½ acres on the north shore of the western section of the lake and but slightly west of the Narrows. Until 1941 this property had been used as a fox farm and also for resort purposes, with cabins and boats for rent. The record indicates that the Petraborgs at present are engaged in defense work but intend to return and carry on their resort business and fox raising in the near future.

After a number of years of inactivity, Youngstown contracted for the services of defendants Zontelli Brothers to construct an earthen dam across the Narrows of Rabbit Lake, and in the early part of 1943 this operation was commenced. Youngstown's admitted plan of operation, after the dam across the Narrows is completed, is to drain all the water from the eastern section of Rabbit Lake (approximately three billion gallons) into the western section at the rate of 15,000 gallons per minute. This will be accomplished by discharge pipes connected with mechanical pumps installed to the east of the Narrows and adjacent to the proposed initial mining operations and running through the Narrows and terminating at a point directly opposite the Petraborg property. Once the eastern section of the lake is drained, Youngstown proposes to strip off the topsoil down to the ore vein and deposit the same in a protective dump, which will be approximately ten feet above the present water level and located to the south of such mining operations.

Plaintiffs contend that Youngstown is operating illegally, inasmuch as it has failed to cause condemnation proceedings to be instituted according to the terms of its lease; that such contemplated

drainage of the lake and subsequent mining operations are in violation of their riparian rights and, if not enjoined, will result in serious damage thereto. Youngstown asserts that, insofar as the Petraborgs are concerned, they will sustain no damage nor suffer any loss different from that sustained by the public generally; that plaintiff Ryan will be benefited in fact rather than suffer loss therefrom; that, in any event, he is by virtue of his past employment as attorney for Youngstown estopped from any attempt to oppose such operations; and that, since Ryan and Youngstown are now cotenants in the property on the eastern section of the lake, Ryan is not in a position to object to the contemplated drainage and mining operations.

■ Youngstown contends that, since Ryan and it are tenants in common and no damage or waste has been shown, Ryan was not entitled to an injunction.

"One cotenant of real estate may, in the absence of any agreement and if he do not exclude the other from a joint occupation with him, exclusively possess and occupy the land, and may make such profit as he can by proper cultivation or other usual means of acquiring benefit therefrom, and retain the whole of such benefits." Shepard v. Pettit, 30 Minn. 119, 121, 14 N. W. 511, 512; Booth v. Sherwood, 12 Minn. 310 (426), 14 Am. Jur., Cotenancy, § 27. See, also, Sons v. Sons, 151 Minn. 360, 186 N. W. 811.

The rationale of the authorities supporting this rule is that each cotenant has at all times the right to enter upon and enjoy every part of the common estate. But such a cotenant's right to retain the use and appropriate the benefits of the land extends only to the products of its proper use and employment and not to anything which is part of the land itself and not severable in the proper use of it. He is undoubtedly liable for waste and destruction of what is of the realty or for acts amounting to a destruction of it. Freeman, Cotenancy and Partition (2 ed.) 258; Shepard v. Pettit, 30 Minn. 119, 14 N. W. 511, *supra.*

Youngstown has endeavored to carry the rule of cotenancy beyond its proper application. Merely because there was unity of posses-

sion between Ryan and it as cotenants does not mean, under the rule stated, that Youngstown has the right to drain the lake and thus take away from Ryan the riparian rights in his property. By draining the lake, Ryan will be excluded from enjoyment of the common property, and Youngstown is therefore denying his rights in the property under Minn. St. 1941, § 559.05 (Mason St. 1927, § 9560), which provides:

"In an action by a tenant in common or joint tenant of real property against a cotenant, the plaintiff shall show, in addition to the evidence of his right, that the defendant either denied the plaintiff's right, or did some act amounting to such denial."

Youngstown is, in effect, ousting Ryan from his property and preventing him from enjoying it as he has a right to do. Kean v. Connelly, 25 Minn. 222, 33 Am. R. 458; Cook v. Webb, 21 Minn. 428; Freeman, Cotenancy and Partition (2 ed.) § 258. The proposed drainage of the lake would destroy his riparian rights. Youngstown is not actually going to mine the Ryan property, but it will take away the riparian rights thereof for the benefit of other property which it does intend to mine. It is taking something which is part of the land itself. Although each cotenant is entitled, equally with all others, to the entire possession of the whole property and of every part thereof so long as he does not exclude his tenant in common from like possession, in this case Youngstown is not only taking possession of the property but is destroying certain rights in it. If the Ryan property were ore-bearing and Youngstown intended to open up a new mine on it, under the general rule, such a development would be considered waste. 14 Am. Jur., Cotenancy, § 29, states the rule:

"* * * it is not waste for a tenant in common of an existing mine to proceed to work it, since properties of such character can be enjoyed only by removing their products. In respect of opening a new mine, however, the rule seems to be different, and in many jurisdictions such a development is held to constitute waste."

"An injunction will issue to restrain injuries to the freehold in the nature of waste between tenants in common." Russell v. Merchants' Bank, 47 Minn. 286, 287, 50 N. W. 228, 28 A. S. R. 368; State ex rel. Norris v. District Court, 52 Minn. 283, 53 N. W. 1157; 14 Am. Jur., Cotenancy, § 78.

We therefore hold that the fact that Ryan was a cotenant with Youngstown in the ownership of the lot abutting upon Rabbit Lake did not preclude him from seeking injunctive relief under the circumstances disclosed by the record.

■ Youngstown further contends that Ryan is estopped to enjoin the drainage of the eastern section of Rabbit Lake because he accepted a retainer and was employed by it to assist in acquiring the drainage rights of the various property owners; that he knew of the company's plan to obtain from all the owners, including himself, drainage rights; and that he is not now in a position to refuse to sell his interest at a figure comparable to what the others received. Youngstown concedes that when Ryan was retained as its attorney he immediately informed it of his interest in the property and that he was employed by Youngstown with full knowledge of that fact and without any understanding as to the disposition of his interest. Youngstown told him it wanted his services regardless of the fact that he owned an interest in the land. In view of that fact and upon the record before us, we are unable to see how estoppel can be spelled out of Ryan's conduct. The relation between an attorney and his client is one of highest trust and confidence, requiring the attorney to observe the utmost good faith and not to allow his private interests to conflict with those of his client. In re Estate of Lee, 214 Minn. 448, 9 N. W. (2d) 245. But where an attorney upon his employment makes full and frank disclosure as to his interests in the property involved in the subject matter of the retainer and the client desires the services of the attorney despite such interest and with full knowledge thereof, the attorney, under such circumstances, has the right to deal as he chooses with his own property. It is only when he has not advised his client of all the facts concerning his interest in the subject

matter of the retainer or litigation that the court will closely scrutinize the transaction so as not to permit him to take advantage of his professional relationship in dealing with his client. 5 Am. Jur., Attorneys at Law, § 49. We know of no rule of law or professional ethics which prevents an attorney, under the circumstances here related, from selling his property at his own price. Having fully disclosed to his client his interest, he is not required to jeopardize his individual rights and sell at a price not agreeable to him.

Youngstown relies upon this statement made in a letter from Ryan under date of December 26, 1925:

"I have concluded that I should not, at this time at least, agree to disposing of it on the basis of the Parker lot, but can and do say now that I will go along with my co-owners in the matter and be very glad to enter into any agreement that the majority of the owners would think proper."

It does not appear that Ryan refused to "go along" with those who held a majority interest in the property. The facts are these: One Blackwood, a client of Ryan's, owned a half interest in the property and in 1912 conveyed to Ryan a 1/16 interest therein. In 1926, Blackwood was in Florida, and Ryan, contemplating a trip there, inquired of Youngstown whether he should interview Blackwood regarding drainage rights. He was told that he should not. He did see Blackwood, not in a professional capacity, but as co-owner, and so advised Youngstown. Blackwood advised both Ryan and Youngstown that he would sell his fee for $250,000. Subsequently Ryan submitted an offer to sell his interest in fee for $35,000, which was based upon the price asked by Blackwood. Both of these offers were rejected, and Ryan thereafter withdrew his proposition. No counter offer has since been made, and up to the time of trial Ryan did not know what amount had been paid to the other owners for drainage rights, except as to two interests not constituting a majority. It is further significant that Youngstown did not acquire the majority of the co-owners' drainage rights until long after Ryan

had given and withdrawn his offer. It is apparent that Youngstown did not rely upon Ryan's statement or his conduct. The affidavit of W. A. Rose, in charge of the mines department of Youngstown's managing agent, dated May 29, 1943, given in connection with the hearing on the order to show cause, states: "That such letter of May 4, 1926 [the offer by Ryan to sell the fee for $35,000], constituted a complete repudiation of the assurances previously given by Ryan and *relied on by said corporation.*" (Italics supplied.) When Youngstown received the letters of December 26, 1925, and May 4, 1926, from Ryan, it did not claim a breach of faith or estoppel. As a matter of fact, no such claim was made during the 17 years that intervened between the withdrawal of the offer and the commencement of this action. It was raised for the first time at the trial of this case. It is elementary that there can be no estoppel without a reliance upon the words or acts of the party sought to be estopped. 2 Dunnell, Dig. & Supp. § 3191, and cases cited.

Since the trial court has found that there was no reliance upon Ryan's statements or conduct, and therefore estoppel did not result, the question for review is whether there is any reasonable evidence to sustain such finding. We hold that there is adequate basis in the record for the court's finding.

■ Youngstown takes the position that Rabbit Lake consists, in reality, of two lakes and that, since it proposes only to drain what it calls the east lake and the Petraborgs are located on what it terms the west lake, no riparian rights of theirs are damaged. The trial court found: "That while Rabbit Lake is comprised of two parts or sections, it is, in fact, one lake and has been so used by persons living on either section or end of the lake." The evidence sustains this finding. In fact, a finding to the contrary would not have been justified. Witness Herbert V. La Victoire, a property owner on the lake, testified: "It has always been considered as one lake. That is called Big Rabbit Lake. It is known generally as that." It appears that it was called "Big" Rabbit Lake to distinguish it from "Little" Rabbit Lake, located near Riverton, Min-

nesota. The record indicates that it was the custom of the shore owners and public generally to boat and fish over both sections and through the Narrows, treating it as one large body of water.

Among the 10,000 lakes for which Minnesota is justly famous, there are many with similar shore lines, resulting in distinct sections connected by narrows. Red Lake, Gull Lake, Lake Minnetonka, and many others have such a conformation. In Lake Minnetonka there are several distinctly formed sections connected by narrow passages. It would be shocking, indeed, for the riparian owners and the public to learn that a lake of such a character is comprised of as many lakes as it has distinct sections connected by narrows, and that therefore one of those sections could be completely drained and closed off without damaging the riparian rights of those situated on other like sections of the lake.

■ Youngstown relies upon its lease for authority to drain Rabbit Lake. Who would be the owner of the lake bed in the event of drainage and whether the taking would be for a public use are questions not necessary or proper for us here to consider. Assuming, without deciding, that the lease and the law pursuant to which it was executed are valid, nevertheless Youngstown was clearly not authorized to proceed until the provision therein for condemnation proceedings had been complied with. Embodied in and made a part of this conveyance is the condition that, if necessary, Youngstown shall request the state to institute condemnation proceedings to pay for the interests of private persons or corporations who may be injured or whose rights may be destroyed by such operation. Such a provision would be necessary in order to comply with the requirement of Minn. Const. art. 1, § 13, and U. S. Const. Amend. XIV, § 1, and the statutory provisions for eminent domain proceedings. Minn. St. 1941, § 117.01 (Mason St. 1927, § 6357). Riparian rights are property rights and cannot be taken away without just compensation made therefor. The state cannot do it nor authorize anyone else to do it. Union Depot, St. Ry. & Tr. Co. v. Brunswick, 31 Minn. 297, 17 N. W. 626, 47 Am. R. 789; 2 Farnham, Waters and Water Rights, § 462.

"* * * The exercise of such rights, though subject to state regulation, can be interfered with only for public purposes. The rights which thus belong to him as riparian owner of the abutting premises are valuable property rights of which he cannot be divested without consent, except by due process of law, and, if for public purposes, upon just compensation." State v. Korrer, 127 Minn. 60, 72, 148 N. W. 617, 622, L. R. A. 1916C, 139; Minnesota C. & P. Co. v. Fall Lake Boom Co. 127 Minn. 23, 148 N. W. 561; Hanford v. St. P. & D. R. Co. 43 Minn. 104, 42 N. W. 596, 44 N. W. 1144, 7 L. R. A. 722.

The law under which the lease was executed provided for condemnation proceedings. Minn. St. 1941, § 93.35, subd. 1 (Mason St. 1927, § 6428). The record indicates that the parties themselves recognized the necessity of condemnation proceedings under the terms of the lease. No condemnation proceedings, however, have ever been commenced, nor was any request made of the state to commence such proceedings. To justify its failure to take such measures, Youngstown contends that, since the Petraborg property is located on the section of the lake which will not be drained, they will suffer no damage different from that of the public generally; that their riparian rights consist only of the right of access to the water—which right is still preserved. Youngstown, in its answer, makes an offer that the court may determine, and that Youngstown will pay, any damage sustained by plaintiffs. The legislature has prescribed the method, through eminent domain proceedings, for the taking of property for public use, and neither Youngstown nor the court has authority to substitute a different manner of settlement as against the exclusive provisions of the statute. That power rests exclusively with the legislature and can be exercised only as prescribed by it. Minnesota C. & P. Co. v. Fall Lake Boom Co. *supra.*

The lower court found that the draining of the eastern section of the lake by Youngstown will constitute a trespass and damage to the riparian rights of the plaintiffs Petraborg, since it will deprive them of the use of that portion of the lake and diminish the value of their property; that such drainage is an unreasonable use

of the water thereof and will destroy all riparian rights of the plaintiff Ryan. It is conceded that Rabbit Lake is a public body of water and is governed by the laws applicable to public or navigable lakes.

As to a public lake, a mutual right of enjoyment exists between and is shared by riparian owners and the public generally. Insofar as such recreational benefits as boating, hunting, and fishing therein, the riparian proprietor has no exclusive privileges. Sanborn v. People's Ice Co. 82 Minn. 43, 50, 84 N. W. 641, 642, 51 L. R. A. 829, 83 A. S. R. 401, where we said, however, with reference to the vested interests of the shore owners:

"* * * There are certain interests and rights vested in the shore owner which grow out of his special connection with such waters as an owner. These rights are common to all riparian owners on the same body of water, and they rest entirely upon the fact of title in the fee to the shore land."

To say that a shore owner does not have additional private rights and interests distinct from the public is to ignore completely those rights which attach by reason of his shore ownership. As so aptly stated in 2 Farnham, Waters and Water Rights, § 462:

"* * * The extent of the property right is well expressed in Warder v. Springfield [9 Ohio Dec. (Reprints)], where it is said that no riparian proprietor owns an integral part of, or has absolute property in, the waters of a stream, but each has only the use of their flow past his lands for ordinary domestic, manufacturing, and other lawful purposes. * * * Such flow and use belong to the land through which it passes, as an incident, convenience, or easement which inseparably connects itself therewith as a part thereof, and frequently gives or adds value thereto; and is a private property right in the proprietor thereof within the protection of the constitutional provision that private property shall be forever held inviolate, subject to the public welfare, and shall not be taken for public use without compensation being first made. *The property, therefore, consists, not in the water itself, but in the added value which the*

*stream gives to the land through which it flows."* (Italics supplied.)
True, the riparian owner takes only to the water line, but he may
deny access to and from the water at his particular property; he
may build piers and wharves from his land out to navigable waters;
he has an exclusive right of access to the lake by reason of his owner-
ship of the abutting land; and he may claim accretions and relic-
tions caused by changes in the current or flow of the water. Bris-
bine v. St. P. & S. C. R. Co. 23 Minn. 114; Union Depot, St. Ry. &
Tr. Co. v. Brunswick, 31 Minn. 297, 17 N. W. 626, 47 Am. R. 789;
State v. Korrer, 127 Minn. 60, 148 N. W. 617, L. R. A. 1916C, 139.
These rights, of course, are subordinate to the paramount rights of
the public. Nelson v. DeLong, 213 Minn. 425, 7 N. W. (2d) 342.
In addition to these very well-defined and settled rights, it must
be borne in mind that frequently the fact that property is located
upon the shore of a lake or stream gives to it its chief value. "It
is regarded as an advantage or element of value to each piece of land
through which it flows, which nature has bestowed upon it * * *."
Schaefer v. Marthaler, 34 Minn. 487, 489, 26 N. W. 726, 727, 57
Am. R. 73; Lamprey v. State, 52 Minn. 181, 53 N. W. 1139, 18
L. R. A. 670, 38 A. S. R. 541. The benefits and facilities arising
from the location of the land on the lake may mean the difference
between a valuable piece of property and one that is comparatively
worthless. Hanford v. St. P. & D. R. Co. 43 Minn. 104, 42 N. W.
596, 44 N. W. 1144, 7 L. R. A. 722. Upon reargument in this case,
the court said (43 Minn. 114, 44 N. W. 1146):

"* * * The barest strip of upland, though wholly valueless and
useless in itself, justifies the owner in the exercise and enjoyment
of the privileges of riparian proprietorship to the fullest extent."

Whether the Petraborg land was located on a lake comprised only
of the western section or upon the whole lake would have a substan-
tial bearing upon its value and riparian rights. Undoubtedly, in
nearly every instance, lake property is purchased because of the
additional advantages and benefits arising from the nearness of
the lake, its size, general character, a consideration for nature's

generosity in affording sandy beaches for swimming and outdoor recreation, its attractiveness for fishing and hunting, together with its natural beauty and scenery. These are rights which the riparian proprietor may enjoy for pleasure or profit. Lake Superior Land Co. v. Emerson, 38 Minn. 406, 38 N. W. 200, 8 A. S. R. 679; Sanborn v. People's Ice Co. 82 Minn. 43, 84 N. W. 641, 51 L. R. A. 829, 83 A. S. R. 401, *supra*. They exist as incidents to the right of the soil adjacent to the water, and have their origin therein and belong to it by nature. Lake Superior Land Co. v. Emerson, *supra*.

In the instant case, the Petraborgs are possessed of all these riparian rights. The record indicates that they have availed themselves in the past, as have their guests, of boating and fishing on the entire lake. This was a facility afforded by reason of their location and ownership of the soil. Youngstown attaches some importance to the fact that the Petraborgs have not used the lake since 1941, but closed their resort business and became employed in defense work. Mere nonuser does not operate as a forfeiture of riparian rights. Reeves v. Backus-Brooks Co. 83 Minn. 339, 86 N. W. 337. The court there said:

"All persons having lands on the margin of a flowing stream have * * * certain riparian rights * * * whether they exercise those rights or not, and they may begin to use them when they choose. It matters not how much the owner of land upon a stream has actually used the water, or whether he has used it at all, his right to it remains unaffected for any period of time."

There is testimony that by far the best fishing was to be had in the eastern section of the lake and that the Petraborgs directed their guests to those more desirable spots. Apart from being deprived of the entire use of the lake by the drainage of approximately half of it, there is serious question as to the effect of pumping three billion gallons of water through the discharge pipes which terminate immediately across from plaintiffs' property. Although Youngstown's assistant general manager testified that it was his best engineering judgment that dewatering the lake would have no effect on the water level of the west bowl, it is questionable

whether the natural outlets from the western section will be able to carry off this large quantity of water as rapidly as it is pumped into it. It conceded that no steps have been taken to protect the water level.

We are therefore of the opinion that the Petraborgs will suffer a damage to their riparian rights by the proposed drainage of the eastern section of the lake different and distinct from that suffered by the public in general. *Cf.* Underwood v. Town Board of Empire, 217 Minn. 385, 14 N. W. (2d) 459, in which this court recently held that an owner of land abutting upon a highway suffered damage by the vacation thereof distinct from that of the public in general.

■ The Petraborgs' riparian rights are held and exercised subject to the reasonable use of the waters by other riparian owners on the lake. Youngstown is such a riparian owner. The trial court made a specific finding that Youngstown's contemplated use of the eastern section was unreasonable. The doctrine of reasonable use was adopted early in our state. See, "What Can A Riparian Proprietor Do?" by Professor Stanley V. Kinyon, 21 Minn. L. Rev. 512. Whether a particular use of common waters is reasonable or not is a question of fact to be determined from the circumstances of each case. As expressed in Red River Roller Mills v. Wright, 30 Minn. 249, 253, 15 N. W. 167, 169, 44 Am. R. 194:

"In determining what is a reasonable use, regard must be had to the subject-matter of the use; the occasion and manner of its application; the object, extent, necessity, and duration of the use; the nature and size of the stream; the kind of business to which it is subservient; the importance and necessity of the use claimed by one party, and the extent of the injury to the other party; * * * and all the other and ever-varying circumstances of each particular case, bearing upon the question of the fitness and propriety of the use of the water under consideration."

It is fundamental that a riparian owner's rights are measured by the necessities and character of his use. Paramount among such uses is the right to the water for ordinary domestic and manufac-

turing purposes. 2 Farnham, Waters and Water Rights, § 465. Here Youngstown intends, for private gain and on a purely commercial basis, not only temporarily to divert but completely to drain the waters from the eastern section of the lake for mining operations that will extend over a period of 20 years. The eastern section, once the source of excellent bass fishing, will be converted into an industrial enterprise in which plaintiffs have no interest. In fact, Youngstown's contemplated operations far exceed a "reasonable use" within the meaning of our decisions. It will amount to a complete dissipation of the waters for a long period of time. A review of cases involving the question of reasonable use indicates that the purposes for which waters are ordinarily employed within that doctrine are far different in character from the instant case.

"* * * All that the law requires of the party by or over whose land a stream passes is that he should use the water in a reasonable manner, and so as not to destroy, or render useless, or materially diminish or affect, the application of the water by the proprietors, above or below." Pinney v. Luce, 44 Minn. 367, 369, 46 N. W. 561, 563.

If the use is such "as to cause substantial damage to the property of other riparian owners, or materially interferes with public rights," it is unreasonable. Meyers v. Lafayette Club, Inc. 197 Minn. 241, 250, 266 N. W. 861, 866. In the instant case, Youngstown's proposed plan of operation will "render useless" the lake so far as plaintiff Ryan is concerned and will "materially diminish" it so far as the Petraborgs' interests are involved. It is not a reasonable exercise by Youngstown of its riparian rights, but rather a destruction of one-half of the lake. Schaefer v. Marthaler, 34 Minn. 487, 26 N. W. 726, 57 Am. R. 73. In Sanborn v. People's Ice Co. 82 Minn. 50, 84 N. W. 642, 51 L. R. A. 829, 83 A. S. R. 401, *supra,* we stated:

"* * * It is elementary that the shore owner may prevent an injury to his land by the lowering or raising of the waters beyond the natural limits of low and high water mark, by artificial means, not

in the exercise of rights common to all, unless such act be expressly authorized by law."

Our North Star state has been called the Land of Ten Thousand Lakes. It has a remarkable natural endowment of lakes, rivers, waterfalls, and woodlands. This Fisherman's Paradise has made Minnesota famous far and wide. Within its 84,068 square miles are 6,271 square miles of water, including the Lake Superior area.[2] In addition to its more than 10,000 lakes of all sizes, it has one of the most interesting systems of rivers in the country. The mighty Mississippi flows out of Lake Itasca in Itasca State Park, joins with the Minnesota and St. Croix Rivers, and flows to the Gulf of Mexico; the Red River winds north to Hudson Bay; the St. Louis and other North Shore streams which flow into Lake Superior find their way to the Gulf of St. Lawrence.[3] A beneficent Creator has made these streams and lakes for all His people. They originate *ex jure naturae,* and, except for the grant of reasonable use to riparian owners, subject to the paramount rights of the state, they are subject only to nature's laws. It is interesting to note that Minnesota derives its name from a river called by the Dakotas "Minisota" ("mini"—water; "sotah"—sky color)—signifying the "sky-tinted water" of its numerous crystal streams and lakes mirroring the soft blue of its skies.[4] These lakes constitute the outstanding natural attraction of our state. An enlightened public opinion has been aroused to an appreciation of the extent and importance of this endowment. Constructive programs have been formulated looking to the conservation and perpetuation of these God-given resources, which offer scenic and piscatorial advantages to our citizens and to an increasing number of sojourners from all parts of the country. It is a well-settled policy of this state that "meandered lakes belong to the state in its sovereign capacity in trust for the public." In re County Ditch No. 34, 142 Minn. 37, 41, 170 N. W.

[2]*Areas of the United States,* 1940, p. 6, published by Bureau of the Census, 1942.

[3]Official Tourist Guide Book, published by Minnesota Tourist Bureau, 1943.

[4]Minnesota Legislative Manual, 1943, p. 3.

883, 885; Nelson v. DeLong, 213 Minn. 425, 7 N. W. (2d) 342; State v. Korrer, 127 Minn. 60, 148 N. W. 617, L. R. A. 1916C, 139.

Rabbit Lake may not be one of the most beautiful or valuable of Minnesota's 10,000 lakes, and its shore line may not compare favorably with many others in natural beauty, yet it is a member of Minnesota's great family of lakes, abounding in sunfish, crappies, and pickerel, and noted as one of the best bass lakes in that section of the state. The destruction of approximately half of it, and, moreover, that part which is most valuable for fishing, should not be tolerated except upon a clear showing of public necessity, and then only pursuant to the constitutional and legislative requirement of making compensation under the exercise of the power of eminent domain. It seems to us to be a truism that the dissipation and destruction of one-half of a lake of this character, under the circumstances disclosed by the record, is not within the contemplation of "reasonable use."

■ The trial court specifically found that Youngstown's proposed activity would constitute a trespass upon and cause damage to plaintiffs' riparian rights. Youngstown asserts that the complaint is inadequate and fails to state the specific damage complained of and that the evidence does not support such a finding. Plaintiffs allege, *inter alia:*

"That the construction of said dike or dam and the drainage of the waters of said lake will permanently deprive plaintiffs of their riparian rights * * * by permanently and continuously for a long period of years damaging and destroying the said lake * * * and the use and enjoyment thereof by plaintiffs for which the plaintiffs have no adequate remedy at law. That such acts on the part of the defendants unless restrained and enjoined will irreparably damage plaintiffs and will deprive them of their property without due process of law."

The ultimate consideration is whether plaintiffs have shown sufficient injury to entitle them to injunctive relief. Youngstown cites many cases involving actions for injunction wherein the petitioners were left to their actions for damages. These cases do not involve

riparian rights, and the injuries there complained of were of an entirely different character from the threatened damage to these plaintiffs. The effect of Youngstown's operations will be to leave plaintiff Ryan with no lake frontage and the Petraborgs with the use of a much smaller portion of the lake. This condition will continue over a period of years. In cases of this nature, the trespass complained of does not necessarily have to be an actual invasion of the plaintiff's property.

"* * * Any substantial or unwarranted interference with them [riparian rights] constitutes a trespass, for which he is entitled to compensation, and, if such trespass is of a permanent character, he is entitled to a writ of injunction prohibiting a continuance of the wrong." Reeves v. Backus-Brooks Co. 83 Minn. 343, 86 N. W. 338, *supra.*

Riparian owners have a right to the "natural flow of the water past their land, and any interference with this flow, to their injury, is a wrong for which they are entitled to an appropriate remedy. To prevent such a wrong, injunction is an appropriate remedy." Morrill v. Saint Anthony Falls Water-Power Co. 26 Minn. 222, 229, 2 N. W. 842, 847, 37 Am. R. 399; Sanborn v. People's Ice Co. 82 Minn. 43, 84 N. W. 641, 51 L. R. A. 829, 83 A. S. R. 401, and Schaefer v. Marthaler, 34 Minn. 487, 26 N. W. 726, 57 Am. R. 73, *supra.* Youngstown's plan contemplates the taking of property without just compensation and without condemnation proceedings as prescribed by the lease and statute. This is a violation of plaintiffs' private rights which they will suffer not in common with the public generally but as a damage solely to their own private property.

Youngstown objects that plaintiffs' damage, if any, has not been shown to be irreparable. In cases of this nature, the rule has been modified as expressed in Bilsborrow v. Pierce, 101 Minn. 271, 276, 112 N. W. 274, 276, which involved damage resulting from a drainage project:

"* * * The relaxation of the rule requiring a prima facie case of irreparable damage as a condition of granting an injunction in such a case as this, and a modification of the enforced standard of such damage obvious in such decisions generally, has been expressly recognized by this court."

In Whittaker v. Stangvick, 100 Minn. 386, 392, 111 N. W. 295, 297, 10 L.R.A.(N.S.) 921, 117 A. S. R. 703, 10 Ann. Cas. 528, it was stated: "There has been a material modification in such cases of the requirements that the injury should be irreparable and the legal remedy inadequate."

We are of the opinion that the complaint sufficiently alleges the injuries which will result if Youngstown's proposed plans are put into operation, and that the evidence sustains the court's finding that such operations, if permitted, will constitute a trespass upon plaintiffs' riparian rights and that the nature of these threatened injuries is such as to entitle plaintiffs to injunctive relief.

Affirmed.

MR. CHIEF JUSTICE LORING and MR. JUSTICE THOMAS GALLAGHER took no part in the consideration or decision of this case.